745 N.W.2d 229 (2008)
275 Neb. 1
STATE of Nebraska, Appellee,
v.
Raymond MATA, Jr., Appellant.
No. S-05-1268.
Supreme Court of Nebraska.
February 8, 2008.
*239 James R. Mowbray, Jerry L. Soucie, and Jeff Pickens, of Nebraska Commission on Public Advocacy, Lincoln, for appellant.
Jon Bruning, Attorney General, and J. Kirk Brown for appellee.
HEAVICAN, C.J., and WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

TABLE OF CONTENTS

 I. Introduction ....................................................................... 240
 II. Background ......................................................................... 240
 1. Events Preceding Mata's Direct Appeal ........................................... 240
 2. Mata's Direct Appeal and Order of Resentencing .................................. 241
 3. Resentencing Proceedings ........................................................ 241

III. Assignments of Error ............................................................... 243
 IV. Standard of Review ................................................................. 243
 V. Analysis ........................................................................... 243
 1. Jurisdiction .................................................................... 243
 2. Arguments That This Court Erred in Ordering Mata's Resentencing Under L.B. 1 244
 3. The Exceptional Depravity Aggravator Is Not Unconstitutional .................... 248
 4. Capital Sentencing Statutes Did Not Prejudice Mata's Right to a Jury Trial ...... 248
 5. The Division of Roles Between the Jury and the Three-Judge Panel Does Not Violate
 the 8th and 14th Amendments .................................................... 249
 6. Jury Was Properly Instructed .................................................... 252
 (a) Use of the Term "Apparently Relished" Did Not Render Aggravator Instruction
 Unconstitutionally Vague .................................................. 252
 (b) Jury Was Not Required to Unanimously Agree on Alternative Theories of
 Exceptional Depravity ..................................................... 253
 7. Proportionality Review .......................................................... 254
 8. Constitutionality of Electrocution .............................................. 255
 (a) Nebraska Constitution Governs the Issue .................................... 256
 (i) Early U.S. Supreme Court Decisions on Electrocution .................. 257
 (ii) This Court's Duty to Safeguard Constitutional Rights ................. 260
 (b) Legal Standards Defining Cruel and Unusual Punishment ...................... 261
 (i) Substantial Risk That Prisoner Will Suffer Unnecessary and Wanton Pain 261
 (ii) Evolving Standards of Decency ........................................ 262
 (iii) Dignity of Man ....................................................... 264

*240
 (iv) No Requirement to Show Legislature Intended to Cause Pain or Lingering
 Death ............................................................... 265
 (c) Standard of Review ......................................................... 266
 (i) Questions of Law and Fact ............................................ 266
 (ii) Deference Due Legislature ............................................ 267
 (d) Parties' Contentions ....................................................... 267
 (e) Nebraska Statutes Require a Continuous Electric Current but Fail to Specify
 Its Strength or Force ..................................................... 268
 (f) Preparations for Electrocution ............................................. 269
 (g) The Prisoner's Body Is Burned .............................................. 269
 (h) 2004 Protocol Will Not Eliminate Risk of Prisoner Burning or Catching Fire 270
 (i) District Court Found Some Prisoners Would Experience Unnecessary Pain
 and Torture ............................................................... 270
 (i) Heart Capable of Restarting .......................................... 272
 (ii) State's Theories of Instantaneous Loss of Brain Function ............. 273
 (iii) Defense Experts Reject State's Theories .............................. 274
 (iv) Evidence Shows Some Prisoners Still Alive ............................ 275
 (v) Sources of Pain in an Electrocution .................................. 277
 (vi) Evidence Supports Court's Finding That Some Prisoners Will Experience
 Unnecessary Pain, Suffering, and Torture ............................ 277
 (j) Conclusion: Electrocution Is Cruel and Unusual Punishment .................. 278
 (k) Resolution ................................................................. 278
 VI. Conclusion ......................................................................... 279

I. INTRODUCTION
A jury convicted Raymond Mata, Jr., of first degree murder and kidnapping. A three-judge panel sentenced Mata to death for the first degree premeditated murder of 3-year-old Adam Gomez. The presiding judge sentenced him to life imprisonment for kidnapping. Between his sentencing and our decision in his first direct appeal, the U.S. Supreme Court decided Ring v. Arizona,[1] which required juries to find whether aggravating circumstances exist in death penalty cases. In State v. Mata (Mata I),[2] we affirmed both of Mata's convictions, but, applying Ring, we vacated his death sentence and remanded the cause for resentencing. After a jury found the existence of an aggravating circumstance, a three judge panel resentenced Mata to death.
In this appeal, Mata argues that this court and the trial court erred in numerous respects regarding his resentencing. He also argues that electrocution is cruel and unusual punishment prohibited by the U.S. and Nebraska Constitutions.

II. BACKGROUND
In June 2000, a three-judge panel sentenced Mata to death for premeditated murder. The three judge panel found the existence of an aggravating circumstance, exceptional depravity, under Neb.Rev.Stat. § 29-2523(1)(d) (Cum.Supp.2002). While Mata's direct appeal was pending, the U.S. Supreme Court promulgated a new constitutional rule and the Nebraska Legislature responded by amending Nebraska's capital sentencing statutes.

1. EVENTS PRECEDING MATA'S DIRECT APPEAL
In June 2002, the U.S. Supreme Court decided Ring.[3] The Court determined, under the Sixth Amendment, that Arizona's aggravating circumstances in capital cases are the functional equivalent of elements that expose a defendant to greater punishment. Therefore, it determined that they must be found by a jury. In November, *241 the Governor signed into law L.B. I,[4] emergency legislation that reassigned responsibility for determining the existence of aggravating factors from judges to juries, as required by Ring, for any capital sentencing proceeding occurring on or after November 23, 2002.
In March 2003, this court decided State v. Gales.[5] We stated that new constitutional rules apply to pending direct appeals. Therefore, under Ring, we vacated the defendant's death sentence because the sentencing judge, not a jury, had determined the existence of aggravating circumstances. We remanded the cause for resentencing and set out a new procedural rule for capital cases in the wake of Ring. We recognized that L.B. 1 had amended Neb.Rev.Stat. § 29-1603 (Reissue 1995) to require that when the State seeks the death penalty, the information must contain a "notice of aggravation which alleges one or more aggravating circumstances." But we concluded that the notice requirement did not apply to the defendant's resentencing because it is a procedural rule that has no retroactive effect.[6] We limited, however, the aggravating circumstances the State could seek to prove at the resentencing hearing to those "which were determined to exist in the first trial, and as to which [the defendant] is therefore on notice."[7]

2. MATA'S DIRECT APPEAL AND ORDER Of RESENTENCING
In September 2003, this court affirmed Mata's convictions and his sentence of life imprisonment for kidnapping in his direct appeal.[8] Although Mata had not raised the constitutionality of Nebraska's capital sentencing scheme at trial, we vacated his death sentence. We found plain error because a sentencing panel had found the existence of a statutory aggravating circumstance. We recognized that double jeopardy concerns attach to capital sentencing hearings in Nebraska. But we decided that Mata's resentencing would not violate the Double Jeopardy Clause because the three judge panel had not acquitted him of the death penalty. There was no acquittal because the evidence was sufficient to (1) find under § 29-2523 the existence of aggravator (1)(d) and (2) conclude that the aggravating factor outweighed the mitigating factors. Under Gales, we directed that on remand, the State could attempt to prove only whether aggravator (1)(d) existed because that was the only aggravator proved at the first trial.

3. RESENTENCING PROCEEDINGS
On remand, before the jury trial on the aggravating circumstance, there were three hearings on defense motions. Mata first moved to prohibit a trial on the existence of aggravator (1)(d) because (1) the original information did not allege any aggravators; (2) Ring had rendered unconstitutional the capital sentencing procedures in effect in 1999, when Mata was originally charged by information; and (3) L.B. 1 had repealed the death penalty statutes in effect in 1999 and now mandated that the State allege aggravators in the information, Mata argued that because the prosecutor had not alleged essential elements of capital murder, the information was fatally defective and the district court lacked jurisdiction. He also alleged that the Double Jeopardy Clause prohibited jury factfinding on aggravating circumstances *242 because the jury had already convicted him of noncapital murder.
In addition, Mata alleged that this court's attempt to correct the new capital sentencing proceedings had invaded the Legislature's province by creating special procedures contrary to L.B. 1. Mata also alleged that our directions for resentencing (1) invaded the prosecutor's discretionary charging authority, (2) violated his due process right to rely on the State's compliance with a sentencing scheme, and (3) violated his Eighth Amendment right to be free from arbitrary sentencing proceedings.
The court overruled that motion and ordered the State to file a verified notice of aggravation. After the State filed the notice, Mata filed a plea in bar, making many of the same allegations. The court determined it lacked jurisdiction to accept that plea. It determined that a plea in bar was not an authorized procedure in a resentencing proceeding after the conviction had become final. Mata then filed a notice of appeal.
While his appeal was pending, Mata filed motions to (1) declare Nebraska's death penalty statutes at the time of the murder unconstitutional under Ring; (2) declare that the statutes at the time of the murder had been repealed; (3) demand the imposition of a life sentence; (4) prohibit any further death penalty proceedings under L.B. 1 as ex post facto legislation because there was no constitutionally valid crime of capital murder in 1999; (5) declare the death penalty statutes unconstitutional and aggravator (1)(d) unconstitutional, facially and as applied; and (6) stay the aggravation trial pending his appeal on the denial of his plea in bar.
After hearing these motions, the court denied the stay because Mata had not been acquitted of the death penalty. Thus, no grounds existed for his plea in bar. It also ruled that it was bound by the law of the case regarding his other motions.
Mata then moved that the court instruct the jury that if it unanimously found the existence of aggravator (1)(d), it must make written findings of all facts that supported the aggravating circumstance. The court did not give that instruction.
After the aggravation trial in January 2005, the jury returned a verdict unanimously finding the existence of the exceptional depravity aggravator. This court dismissed Mata's appeal regarding his plea in bar for lack of jurisdiction under Neb. Ct. R. of Prac. 78(1) (rev.2001).[9]
In March 2005, the trial court heard a joint motion from Mata and Jeffrey Hessler, another death row inmate, to declare electrocution as the method of inflicting death unconstitutional. After receiving evidence at a hearing, the court overruled the motion in an extensive order, which we will discuss later in addressing his claim that electrocution is cruel and unusual punishment. It concluded that it was bound by appellate decisions holding that electrocution did not constitute cruel and unusual punishment.
In June 2005, a three judge panel heard evidence on mitigation and sentencing disproportionality. The panel found no statutory mitigating circumstances. It also considered five non-statutory mitigating circumstances but concluded that they did not approach or exceed the weight of the exceptional depravity circumstance. After also concluding that the penalty was not excessive or disproportionate to the penalty imposed in similar cases, the panel sentenced Mata to death.

*243 III. ASSIGNMENTS OF ERROR
Mata assigns, renumbered and restated, that the district court erred in resentencing him to death because (1) the court did not have jurisdiction over the aggravation hearing pending his appeal regarding his plea in bar, (2) the new sentencing procedures could not be used when the information failed to allege aggravating circumstances, (3) his death sentence violated prohibitions against double jeopardy and ex post facto legislation, (4) the "exceptional depravity" aggravator could not be rationally applied because this court has not sufficiently defined it, (5) the role assignment of factfinding by the jury and weighing by the three judge panel violates the 8th and 14th Amendments, and (6) his right to a jury trial was prejudiced because the sentencing scheme gives greater procedural protections to defendants who waive their right to a jury.
In addition, Mata assigns that the court erred by (1) instructing the jury on alternative theories to prove the exceptional depravity aggravator without requiring that the jurors unanimously agree on a theory and state which facts they unanimously found to support that theory and (2) giving the jury an instruction on alternative theories when one of them was unconstitutionally vague. Finally, Mata assigns that the district court erred in failing to hold that electrocution as the sole method of judicial execution under Neb.Rev. Stat. § 29-2532 (Reissue 1995) is unconstitutional.

IV. STANDARD OF REVIEW
Except for Mata's claim that electrocution constitutes cruel and unusual punishment, all Mata's assignments of error present questions of law. When we review questions of law, we resolve the questions independently of the lower court's conclusions.[10] We discuss our standard of review for challenges to a method of execution in section V8(c)(i) below.

V. ANALYSIS

1. JURISDICTION
Initially, we address Mata's jurisdictional argument. If the district court lacked jurisdiction, we acquire no jurisdiction.[11] When a jurisdictional question does not involve a factual dispute, we determine the issue as a matter of law.[12]
Mata contends that the district court lacked jurisdiction to conduct an aggravation hearing or impose the death sentence. He argues the court lacked jurisdiction while the appeal from his plea in bar was pending. The district court determined that the plea in bar statute, Neb.Rev.Stat. § 29-1817 (Reissue 1995), only permits a defendant to file a plea in bar before entering a plea to the general issues. Because the jury had already convicted Mata and this court had affirmed his convictions, the district court concluded that the statute did not authorize a plea in bar for a resentencing proceeding. Mata, however, argues that because the district court required the State to file a notice of aggravating circumstances, it effectively allowed the State to amend the original information to charge the crime of capital murder. So, he contends that he was required to file a plea in bar and appeal to preserve the issues.
*244 Mata argues that in State v. Kula,[13] this court recognized that a defendant could file a plea in bar after a direct appeal. That case, however, is distinguishable. In Kula, we had previously reversed the defendant's convictions because we concluded that the trial court erred in failing to grant the defendant a new trial for prosecutorial misconduct. On remand, the defendant filed a plea in bar regarding the retrial. In contrast, in Mata I, we affirmed Mata's convictions. Moreover, we rejected Mata's double jeopardy argument that the State had convicted him of the lesser-included offense of noncapital murder and that the State could not convict him of capital murder in a resentencing proceeding.[14] Thus, Mata's convictions were final after this court's decision in his first direct appeal. We remanded the cause only for resentencing.
The district court correctly determined that a plea in bar was not a proper procedure under these circumstances. It was bound by the law of the case; our order limited its authority. It did not have authority to enter a judgment or order different from, or in addition to, this court's directions for resentencing. When we remand a cause with specific directions, the lower court has no power to do anything but to obey the mandate,[15]
Moreover, a plea in bar was not necessary to preserve these issues. The district court had previously addressed Mata's motion to prevent an aggravation hearing, in which motion Mata raised the same arguments. The court overruled that motion and apparently, out of an abundance of caution, ordered the State to file a verified notice of aggravation. But the notice was not required under our directions for resentencing. We explicitly stated in Mata I that the notice requirement was a procedural statute that was not applicable to steps already taken, in Mata's first capital sentencing hearing. And we limited the State's case to the aggravating circumstance that the three-judge panel had previously found to exist in Mata's first sentencing hearing, of which Mata was on notice. But our conclusion that the further notice was not required does not establish that we ordered Mata to be tried for capital murder on an information that failed to allege the essential elements of capital murder.

2. ARGUMENTS THAT THIS COURT ERRED IN ORDERING MATA'S RESENTENCING UNDER L.B. 1
Mata argues that his original death sentence was void ab initio because Ring invalidated Nebraska's capital sentencing statutes that were in effect when he committed the murder. From this premise, he advances a garden of arguments, claims, and contentions. He argues that under the original statutes, the State could not sentence him to death because those statutes did not provide a constitutionally valid procedure for imposing a death sentence and because the Legislature had repealed the statutes since he committed the offense. Therefore; he argues that the jury had already convicted him of noncapital murder. He further argues that L.B. 1 has created two substantive categories of first degree murder: noncapital first degree murder, for which the punishment is life imprisonment when a county attorney does not allege aggravating circumstances, and capital first degree murder, for which the punishment is potentially death *245 when the county attorney alleges aggravating circumstances.
So, Mata contends that when the county attorney filed notice of an aggravator, it increased the charge to capital murder, which violated the prohibition against double jeopardy.[16] In the same vein, Mata argues that resentencing him under the new capital sentencing procedures exposed him to greater punishmentdeaththan he could have received under the original statutes. He contends that this exposure to greater punishment violated the prohibition against ex post facto legislation.[17] Also, Mata argues that in our opinion in Mato, I, we did not have authority to order the State to prosecute him for capital murder when the information initially failed to allege aggravating circumstances. Finally, he contends that due process required the State to allege the aggravating circumstances in the information. These arguments sprout from the same soilthat under L.B. 1, aggravating circumstances are essential elements of a newly created offense of capital first degree murder. We plowed that ground in Gales and Mata I.
In Gales, the defendant's appeal was pending when Ring was decided. We recognized that new constitutional rules apply to all state or federal cases which are pending on direct review or are not yet final when the rule is announced.[18] We therefore concluded that Ring required us to vacate the defendant's death sentence and remand the cause for resentencing under the new procedures in L.B. 1. We held that the reassignment in L.B. 1 from judges to juries to decide whether aggravating eating circumstances exist is a procedural change that does not violate ex post facto principles.
We further recognized that the "aggravation hearing" under Neb.Rev.Stat. § 29-2520 (Cum.Supp.2006) was triggered by a notice of aggravation, which had not been filed. But the aggravation notice requirement in L.B. 1 was a new procedure. We therefore held it did not apply to the defendant's resentencing because there was no requirement of such notice when the State initially filed the information or at any time before the defendant's trial or first sentencing hearing. Nonetheless, we held that the State could "seek to prove only those aggravating circumstances which were determined to exist in the first trial, and as to which [the defendant] is therefore on notice."[19]
In Mata I, we rejected Mata's argument that we had erred in holding that the new "notice of aggravation" provision under L.B. 1 was not applicable to resentencing proceedings. We further rejected his argument that this holding amounted to our overruling the Legislature. We reasoned that our procedural rulelimiting the aggravating circumstances the State could attempt to prove at resentencing to those that it proved in the first trialgave effect to the Legislature's intent to give the defendant notice of the aggravating factors that the State would seek to prove.
Mata contends that we incorrectly analyzed the ex post facto issue because we failed to consider that Ring rendered unconstitutional the death penalty statutes in effect when he committed the murder. *246 We disagree. Our conclusion that the State could resentence Mata under the new capital sentencing statutes would not have been different if we had specifically held that Nebraska's original sentencing statutes were unconstitutional. The Arizona and Idaho Supreme Courts have rejected Mata's "void ab initio" argument, despite holding that Ring invalidated their capital sentencing statutes.[20] Both courts relied upon the U.S. Supreme Court's decision in Dobbert v. Florida,[21] which dealt with similar issues and arguments.
In Dobbert, at the time the defendant murdered his children, Florida's capital sentencing statutes mandated death unless the jury recommended mercy. After the defendant committed the murders, but before the State tried him, a new constitutional rule led to the amendment of Florida's capital sentencing statutes. First, the U.S. Supreme Court struck down capital sentencing schemes that gave the jury complete discretion whether to impose a death sentence.[22] Then, the Florida Supreme Court held that the state's capital sentencing statute was unconstitutional, and the Florida Legislature amended the statutes. The new statutes provided for the jury to render an advisory recommendation of a life sentence or death and for the judge to impose the actual sentence. The judge sentenced the defendant to death despite the jury's recommendation of a life sentence.[23]
The U.S. Supreme Court concluded that the amendment "simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime."[24] It also concluded that the statutory shift in sentencing from the jury to the judge did not make a death sentence any more probable.[25] Like Mata, the defendant in Dobbert argued that the State could not have sentenced him to death under the original statutes because the Florida Supreme Court later declared them unconstitutional and that therefore, the procedural changes increased his punishment. But the U.S. Supreme. Court concluded that "this sophistic argument mocks the substance of the Ex Post Facto Clause."[26] Because Florida's statutes permitted the death penalty for his offense at the time it was committed, the defendant knew his crime was a capital offense.[27] Moreover, the procedural change did not reflect a legislative intent to target any specific persons or classes of persons.[28] Therefore, mere procedural changes to comply with new constitutional rules do not disadvantage a defendant or impose additional punishment even if the procedures in effect when the defendant committed the offense are later declared unconstitutional. Under Dobbert, Mata's argument that his punishment was increased by the enactment of L.B. 1 fails.
Similarly, Mata incorrectly argues that L.B. 1 created a new substantive crime of capital first degree murder, for which aggravators *247 are essential elements. The Legislature intended L.B. 1 to comply with the U.S. Supreme Court's decision in. Ring. It specifically stated that aggravating circumstances "are not intended to constitute elements of the crime generally unless subsequently so required by the state or federal constitution."[29] The U.S. Supreme Court rejected in Schriro v. Summerlin the "elements" argument that Mata makes here.[30]
In Summerlin v. Stewart,[31] the Ninth Circuit had concluded that Ring announced a substantive rule that applied retroactively. The Ninth Circuit reasoned that because Ring treated aggravating circumstances as "the functional equivalent of... element[s]," the decision "reintroduced `capital murder' as a separate substantive, offense."[32] Thus, the court concluded that Ring redefined the substantive elements of capital murder. The U.S. Supreme Court reversed the decision of the Ninth Circuit and held that Ring was a procedural, not a substantive, decision. As we discussed in State v. Hessler,[33] the Court clarified in Schriro that aggravating circumstances are not elements for Sixth Amendment purposes.[34]
We reaffirm our holding in Gales that Ring is not a substantive change in Sixth Amendment requirements and did not make aggravating circumstances essential elements of capital murder. Instead, Ring extended Sixth Amendment jury protections to the finding of aggravating circumstances.[35] Because the Legislature intended that aggravating circumstances not be considered elements unless constitutionally required, L.B. 1 also did not create new elements for first degree murder.
The federal courts of appeals' decisions that Mata relies on are distinguishable. Those courts held that in federal prosecutions, aggravating factors must be included in a grand jury indictment.[36] But those decisions are based on the grand jury clause of the Fifth Amendment, and this provision has not been made applicable to the states.[37]
The Sixth Amendment requires states to give defendants sufficient notice to ensure that they have an opportunity to defend against the charges.[38] But other state courts have specifically held that resentencing necessitated by the new rule of procedure in Ring does not violate either the defendant's due process rights or the defendant's Sixth Amendment right to notice.[39] Like this court, *248 they concluded that the State was not required to file a statutory notice of aggravators in a charging instrument when the defendant had actual knowledge of the aggravators the State would seek to prove at the resentencing hearing.
Constitutionally sufficient notice was not an issue for Mata's resentencing. We specifically limited the State's cause on remand to attempting to prove the aggravator of which Mata had full notice. The State had already proved the exceptional depravity aggravator at his first sentencing hearing and, additionally, filed a notice of aggravation before the resentencing hearing. Thus, Mata's due process and Sixth Amendment rights to notice were not violated.
Further, because aggravating circumstances are not essential elements of a new substantive crime of capital murder, the county attorney did not increase the charge by filing an aggravation notice. For the same reason, this court's holding that the notice of aggravation in L.B. 1 was not applicable to Mata's resentencing did not invade the Legislature's province to define crime or the county attorney's authority to charge crimes. We reject Mata's arguments that we erred in ordering his resentencing.

3. THE EXCEPTIONAL DEPRAVITY AGGRAVATOR IS NOT UNCONSTITUTIONAL
Mata assigns that the exceptional depravity prong of § 29-2523(1)(d) is unconstitutional, facially and as applied to his case. In one sentence, he contends that neither the statute nor our previous interpretations of it have sufficiently defined this aggravator so that it can be rationally and consistently applied. The Eighth Circuit Court of Appeals has held that this court's definition of the exceptional depravity definition under § 29-2523(1)(d) is constitutional.[40] Mata does not explain why aggravator (1)(d) has not been sufficiently narrowed in the face of this authority. An argument that does little more than to restate an assignment of error does not support the assignment, and this court will not address it.[41]

4. CAPITAL SENTENCING STATUTES DID NOT PREJUDICE MATA'S RIGHT TO A JURY TRIAL
The jury instruction on exceptional depravity provided three alternative theories that would prove the existence of aggravator (1)(d). Under Neb.Rev.Stat. § 29-2521(2) (Cum.Supp.2006), if Mata had waived his right to a jury trial, the members of the three-judge panel would have been required to make written findings of the facts that they unanimously found to exist in support of an aggravating circumstance. The statutory procedures do not also require the jury to unanimously find the existence of an alternative theory showing exceptional depravity. Thus, Mata argues, the statutes have a chilling effect on his right to choose a jury trial under the Sixth Amendment. Mata relies on the U.S. Supreme Court's decision in United States v. Jackson.[42]
In Jackson, the Court declared that the death sentence provision of a criminal statute was unconstitutional. Under the statute, a court could sentence a defendant to *249 death only if the jury recommended death in its verdict. A defendant could therefore completely avoid a death sentence by pleading guilty or waiving a jury trial, which needlessly coerced defendants to give up these constitutional rights. But "Jackson did not hold, as subsequent decisions have made clear, that the Constitution forbids every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights."[43]
For example, the U.S. Supreme Court held that Jackson did not invalidate New Jersey's capital sentencing statute.[44] That statute allowed the judge, in accepting a no contest plea, to impose a term less than the mandatory life sentence required if a jury convicted the defendant of first degree murder. Because the judge could also impose the maximum punishment, the defendant could not avoid that punishment by pleading no contest. The Court held that his right to a jury trial was not unconstitutionally burdened.[45] Therefore, Jackson challenges are limited to statutory schemes that allow a defendant to completely avoid the punishment that a jury could impose.
We rejected a Jackson challenge in Hessler.[46] The defendant argued that Nebraska's capital sentencing scheme violated, the Sixth Amendment. He claimed that it forces a defendant to waive his right to a jury's determination of aggravating circumstances if the defendant prefers to have the same fact finder determine both the aggravating circumstances and the sentence. We concluded that Jackson was not applicable because the defendant could not avoid the risk of death by waiving his right, to a jury. We reasoned that there was no clear advantage to forgoing a jury. We stated that while a sentencing panel might be more versed if it had also found the aggravating circumstances, this does not mean that its sentence would necessarily be more favorable to the defendant.[47]
The same reasoning applies here. Requiring three judges to unanimously agree on any fact supporting an aggravating circumstance does not necessarily make a favorable sentence more likely than requiring 12 jurors to unanimously agree under alternative theories. Because Mata could not avoid the risk of death by waiving his right to a jury, we conclude that his Jackson challenge fails.

5. THE DIVISION OF ROLES BETWEEN THE JURY AND THE THREE-JUDGE PANEL DOES I NOT VIOLATE THE 8TH AND 14TH AMENDMENTS
Under Nebraska's capital sentencing scheme, a jury, if not waived, only determines the existence of aggravating circumstances.[48] A three-judge panel determines the existence of mitigating circumstances, weighs aggravating and mitigating circumstances, and determines the sentence.[49] Mata contends that a three-judge panel cannot properly weigh aggravating and mitigating circumstances. He argues the panel has no guidance from the jury as to the weight to apply to aggravators compared to mitigators. He contends that the sentencing scheme is therefore *250 arbitrary and capricious and violates the 8th, and 14th Amendments.
The 8th Amendment, made applicable to the states through the 14th Amendment,[50] requires states authorizing the death penalty to adopt procedures that will avoid imposing it in an arbitrary and capricious manner.[51]
In Gales,[52] we determined that for Sixth Amendment purposes, Ring did not require jury sentencing in capital cases, as long as the jury determined the existence of aggravating circumstances. But we also discussed Eighth Amendment challenges to capital sentencing schemes. We pointed out in Gales that the U.S. Supreme Court had upheld Florida's capital sentencing scheme against Eighth Amendment arbitrary and capricious challenges twice.[53] Nebraska's and Florida's sentencing schemes are similar in the limited role that juries play in sentencing capital defendants.[54]
Before the Legislature enacted L.B. 1 in response to Ring, juries in Nebraska had no participation in capital sentencing procedures. The jury's role was limited to determining whether the defendant was guilty of first degree murder.[55] Under Florida's sentencing scheme, the jury's verdict regarding whether a court should sentence the defendant to death is only advisory. "[T]he actual sentence is determined by the trial judge."[56] In Proffitt v. Florida,[57] an Eighth Amendment case involving Florida's statutes, the U.S. Supreme Court commented on jury sentencing:
This Court has pointed out that jury sentencing in a capital case can perform an important societal function ... but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.
Relying on Proffitt, this court has held that the absence of jury sentencing in Nebraska's sentencing scheme does not violate the Due Process Clause.[58]
Later, in Spaziano v. Florida,[59] the U.S. Supreme Court rejected a challenge that a Florida trial judge's imposition of the death penalty after the jury had recommended a life sentence violated the Eighth Amendment. The Court's statement in Spaziano emphasizes that judicial sentencing does not violate the Eighth Amendment's twin procedural requirements in death penalty cases that (1) a state rationally narrow those eligible for the death penalty and (2) the sentencer *251 consider the individual circumstances of the defendant and his or her crime.

"[T]he purpose of the death penalty is not frustrated by, or inconsistent with, a scheme in which the imposition of the penalty in individual cases is determined by a judge." ...
"... [W]e are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme."[60]
Similarly, the Court rejected a challenge that Alabama's sentencing scheme violated the Eighth Amendment.[61] At that time, Alabama's statutes required the jury to fix the punishment at death if it convicted the defendant of a specified aggravating circumstance. But the trial judge Could refuse to accept the jury's death penalty and impose a life sentence instead. After the conviction, the judge received evidence of aggravating and mitigating circumstances and independently determined whether the aggravating circumstances outweighed the mitigating circumstances. The jury's sentence would have been unconstitutional if dispositive, and the Court clearly questioned the wisdom of the scheme and pointed out that Alabama had abandoned it. Nonetheless, it held that the scheme did not violate the. Eighth Amendment because the trial judge was the true sentencing authority and was not required to give any deference to the jury's sentence.
Since Ring, of course, the Sixth Amendment requires that juries determine the existence of aggravating circumstances before a defendant can be considered eligible for the death penalty. But this role change in Nebraska's sentencing procedures is not significantly different from the advisory role that juries play under the Florida scheme or the jury's mandatory death sentence under the Alabama scheme. In both cases, the jury effectively determined that the defendant was death eligible. The trial judge, who was the actual sentencing authority, considered the individual circumstances of the defendant and his crime.[62]Ring has not altered the Court's determination that jury sentencing is not required for Eighth Amendment purposes. As we pointed out in Gales, one justice in Ring concurred in the decision that juries must determine the existence of aggravators because he believed that the Eighth Amendment requires jury sentencing.[63] But no other justice joined this concurrence.
The U.S. Supreme Court has recognized that not all experts agree jury sentencing is desirable in capital cases.[64] It has explicitly stated that judicial sentencing could lead to greater consistency in the imposition of capital punishment.[65] But "[w]hatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions."[66]
Absent any authority to the contrary, we conclude that judicial sentencing is an acceptable means of ensuring, that *252 this state does not sentence defendants to death in an arbitrary and capricious manner. We have already held that neither due process nor the Sixth Amendment requires jury sentencing.[67] We conclude that the Eighth Amendment similarly does not require jury sentencing.

6. JURY WAS PROPERLY INSTRUCTED
Mats assigns that the district court improperly instructed the jury in two respects. First, he argues the court should have required jurors to reach a unanimous decision on the State's alternative theories of exceptional depravity. Second, he contends that the wording of one of the alter native theories was unconstitutionally vague. We reject both arguments.
(a) Use of the Term "Apparently Relished" Did Not Render Aggravator Instruction Unconstitutionally Vague
Mata contends that the district court erred in instructing the jury that the State can satisfy the "exceptional depravity" aggravator in § 29-2523(1)(d) by proving that "the defendant apparently relished the murder." (Emphasis supplied.) He argues that the use of the term "apparently relished" rendered the instruction unconstitutionally vague. He contends it is not clear whether the term refers to the juror's perception or the defendant's mental state. Mata cites no authority for this argument.
Whether jury instructions given by a trial court are correct is a question of law.[68] In death penalty cases, the key inquiry in examining eligibility and selection factors is whether they are neutral and principled.[69] In determining whether an aggravating circumstance, is unconstitutionally vague, the court should consider whether it "creates an unacceptable risk of randomness, the, mark of [an] arbitrary and capricious sentencing process."[70] An aggravating factor must be sufficiently narrow so that it does not apply to everyone convicted of first degree murder.[71] But "[b]ecause the proper degree of definition' of eligibility and selection factors often `is not susceptible of mathematical precision,' [a] vagueness review is quite deferential."[72] "[A] factor is not unconstitutional if it has some `common-sense core of meaning'" that a juror can understand.[73]
Jury instruction No. 2, in relevant part, provided:
The State of Nebraska has alleged the following aggravating circumstance existed at the time the defendant committed the crime of first degree murder:
"That the murder manifested exceptional depravity by ordinary standards of morality and intelligence"
The aggravating circumstance is presumed not to exist. That means you may not return a verdict that it does exist unless you unanimously decide the state has proved its existence beyond a reasonable doubt.
....
The essential elements necessary to prove the alleged aggravating circumstance of exceptional depravity are either that:

*253 1. the defendant apparently relished the murder; or
2. the defendant inflicted gratuitous violence on the victim; or
3. the defendant needlessly mutilated the victim.
These three alternative theories come directly from this court's five-factor test for applying the "exceptional depravity" aggravator,[74] As noted, the Eighth Circuit has held these five factors are constitutional.[75] In addition, we have previously concluded that the phrase "apparent effort to conceal" in aggravator (1)(b) of the earlier version of § 29-2523 referred to the fact finder's perspective of the defendant's conduct.
Before 1998, aggravator (1)(b) provided: "The murder was committed in an apparent effort to conceal the commission of a crime ..." In State v. Reeves,[76] we agreed with the federal district court that "`apparent' means `readily perceptible'" and further agreed that aggravator (1)(b) "cannot be applied in speculative situations or where a strained construction is necessary to fulfill it." After the Legislature removed "apparent" from aggravator (1)(b) in 1998, the defendant in State v. Lotter[77] argued that the change had narrowed this aggravator's application, which necessitated resentencing. Thus, we considered the effect that change had on what the sentencing panel must conclude to find the existence of this aggravator.[78] We first considered the meaning of the phrase "apparent effort" before the amendment. We noted that "readily perceptible" means easily capable of being noticed. We stated that before the amendment, "apparent effort" meant that "for the sentencing panel to conclude that [the defendant] murdered ... in an `apparent effort to conceal the commission of a crime,' it must have been obvious to the panel that that was [the defendant's] purpose."[79] We concluded that "apparent" had no substantive meaning and was an obtuse way of stating that the aggravator must be proved beyond a reasonable doubt.
Although the challenge in Lotter was different, we concluded that "apparent" clearly refers to the fact finder's perception. By analogy, we conclude that a juror. would have clearly understood that the term "apparently relished" in our five-factor test under § 29-2523(1)(d) referred to his or her own perception of Mata's conduct. The instruction was therefore not unconstitutionally vague.

(b) Jury Was Not Required to Unanimously Agree on Alternative Theories of Exceptional Depravity
Mata contends that the district court erred in instructing the jury on three alternative theories that would prove the aggravating circumstance of "exceptional depravity." He contends that the court should have required the jury to unanimously agree on a theory and to state the facts and theory it had unanimously found.
A jury need not be unanimous on which theory it relies on to convict a defendant of first degree murder, as long as *254 each juror is convinced beyond a reasonable doubt that the defendant committed the crime.[80] In State v. White,[81] we stated that a plurality of the U.S. Supreme Court had agreed the mens rea element of first degree murder could be satisfied by proving that the defendant committed either premeditated murder or felony murder. Mata contends that although we have referred to this plurality opinion, we have not applied its test. He further contends that instructing on alternate theories of exceptional depravity was improper under this test because the theories do not carry equal weight of culpability.
In Schad v. Arizona,[82] the plurality adopted a due process "fundamental fairness" test for determining whether a court should treat alternative theories as separate offenses. Under that test, if a jury could never reasonably consider alternative theories as moral equivalents, then' the jury must unanimously agree on a theory. Even if we applied this test, the question would be whether the alternative theories of exceptional depravity may ever be treated as moral equivalents.[83]
More recently, however, in Richardson v. United States,[84] the U.S. Supreme Court, citing Schad, stated: "[This Court has indicated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." The Court explained that juries need not unanimously agree on
which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime.... Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement a disagreement about means would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.[85]
These U.S. Supreme Court decisions are dealing with elements of crimes, and we have determined aggravators are not elements of the crime of capital murder. Our five-factor test may be analogous to the "means" by which the State can establish the aggravator of exceptional depravity. But it nonetheless makes no difference whether the jurors divided on whether the State proved Mata apparently relished the murder, inflicted gratuitous violence on the victim, or needlessly mutilated the victim. Under Richardson, the jurors were not required to unanimously agree on the means by which Mata manifested exceptional depravity under § 29-2523(1)(d). We conclude that this assignment of error is without merit.

7. PROPORTIONALITY REVIEW
Under Neb.Rev.Stat. § 29-2521.03 (Reissue 1995), we are required, upon appeal, to determine the propriety of *255 a death sentence by conducting a proportionality review.[86] This review requires us to compare the aggravating and mitigating circumstances with those present in other cases in which a district court imposed the death penalty. This is to ensure that the sentence imposed here is no greater than those imposed in other cases with the same or similar circumstances.[87]
Both a three judge panel after Mata's trial, and a jury after we remanded for resentencing, have unanimously found that the State proved the exceptional depravity aggravator beyond a reasonable doubt. At his resentencing, after the jury returned its verdict on aggravator (1)(d), the three-judge panel received evidence of aggravating and mitigating circumstances and sentence proportionality. The evidence from the trial is set forth in more detail in Mata I.[88] For proportionality review, it is sufficient to say that the evidence at the aggravation hearing showed Adam's skull had been fractured by multiple blows of blunt force trauma at or near the time of death and that Mata had dismembered Adam's body and disposed of it in pieces. Experts were unable to determine the cause or time of Adam's death. The sentencing panel concluded the evidence showed that Mata had relished killing Adam with gratuitous violence and unnecessary mutilation. The panel concluded that Mata did this to affect Adam's mother because he believed she was pushing him out of her life in favor of Adam's father.
The sentencing panel found that the aggravating circumstance under these facts was sufficient to justify the death penalty. It further concluded that the weight of the nonstatutory mitigating circumstances it considered did not approach or exceed the weight of the exceptional depravity circumstance. The sentencing panel stated that "[t]he depravity shown from these facts stands out and sets this case apart from [other Nebraska cases where the death sentence was not imposed]. It shows a mind so bereft of redemption that justice demands a sentence of death."
We have reviewed our relevant decisions on direct appeal from other cases in which a district court found aggravating circumstances and imposed the death penalty.[89] We take particular notice of cases involving gratuitous violence inflicted upon young children.[90] Having reviewed the relevant cases, we find that the imposition of the death sentence is proportional to that in the same or similar circumstances.

8. CONSTITUTIONALITY OF ELECTROCUTION
Mata contends that the district court erred in failing to find that death by electrocution under § 29-2532 unconstitutionally imposes cruel and unusual punishment. The State, however, contends that Mata has failed to carry his burden of proof that electrocution is cruel and unusual punishment. It further contends no precedent exists to support Mata's position because neither this court nor the U.S. Supreme Court has ever held that a method of inflicting death is unconstitutional.
We pause to clarify what this case is not about. Mata does not argue that the death penalty, in any form, violates the U.S. and Nebraska Constitutions, nor could he. "[T]he death penalty, when properly imposed by a state, does not violate *256 either the eighth or [the] fourteenth amendment [to] the United States Constitution or Neb. Const, art. [I], § 9."[91] So the issue before us is not whether Mata will be executed, but only whether the current statutory method of execution is constitutional.
We have affirmed Mata's conviction and death sentence; we have affirmed the jury's finding that his crime was exceptionally depraved; and we have determined that the imposition of the death sentence in this case is proportional to that in the same or similar circumstances. But this court's finding that Mata's crime was heinous does not negate our duty to safeguard our state Constitution.
Obviously, all capital offenses involve heinous crimes. The people of Nebraska, through the Legislature, have determined that in some circumstances, the State may impose the death penalty. And we may not interfere unless the State's procedures in executing the prisoner violate constitutional requirements.
We limit our analysis to whether the State may constitutionally execute a sentence of death by electrocution. We must decide whether electrocution is prohibited by the Nebraska Constitution's proscription against inflicting cruel and unusual punishment. That determination, however, does not affect Mata's sentence of death.

(a) Nebraska Constitution Governs the Issue
It is correct that we have held that electrocution does not constitute cruel and unusual punishment within the meaning of the U.S. or Nebraska Constitution.[92] But we have not previously had the opportunity to review a factual record showing electrocution's physiological effects on a prisoner, nor have we relied on any case in which such evidence was reviewed. Instead, we have relied on U.S. Supreme Court decisions. As explained below, those cases contain factual assumptions that some of the Court's more recent cases have called into question.
Unlike other recent cases where we declined to revisit this issue, Mata's constitutional challenge to electrocution is not procedurally barred[93] and the parties have presented us with a full evidentiary record.[94] We also declined to address the issue in Mata's first appeal because we remanded the cause for resentencing. "[T]he possibility remain[ed] that Mata [would] not be resentenced to death, or that the Nebraska Legislature [would] address this issue prior to the conclusion of Mata's resentencing."[95] But the Legislature did not address the issue. In this appeal, we have a full evidentiary record. We conclude that evolving standards of decency are applicable to method-of-execution challenges. Those standards require that we now review the evidence presented in this case in the light of modern scientific knowledge.
At the trial level, Mata moved for a declaration that electrocution is cruel and unusual punishment under both the federal and state Constitutions. The issue was developed and tried as a challenge under both Constitutions. Although in his *257 brief, Mata assigned that electrocution violates the U.S. Constitution, he did not specifically cite to the Nebraska Constitution's prohibition against cruel and unusual punishment. Under our court rules, this oversight could preclude us from considering the state constitutional issue. However, because of the death penalty's severity and irrevocability, we have not strictly enforced briefing rules on capital defendants.[96]
Moreover, for reasons explained below, we conclude that the Nebraska Constitution governs this issue. We have already. decided that we have a constitutional responsibility to determine whether electrocution is lawful. We stayed the execution of Carey Dean Moore, another death row inmate, pending the outcome of that determination.[97] Also, three other cases on our docket have raised the constitutionality of electrocution under the Nebraska Constitution.[98] We conclude that it is imperative for this court to resolve this issue. In fulfilling our responsibility and in the interest of judicial economy, we excuse the technical omission in Mata's brief.
The Nebraska Constitution, article I, § 9, mirrors the U.S. Constitution's Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."[99] Obviously, we cannot"under the U.S. Constitution, declare that electrocution violates its cruel and unusual punishment provision because the U.S. Supreme Court has held otherwise. And we have stated that the Nebraska Constitution's cruel and unusual punishment provision "`does not require more than does the [Eighth Amendment to the] U.S. Constitution.'"[100] But as we will explain, we now believe this issue should be resolved by this court.
Like this court, the U.S. Supreme Court has never reviewed objective evidence regarding electrocution's constitutionality. The Supreme Court based its holdings on state courts' factual assumptions, which, in turn, relied on untested science from 1890. Because we conclude that we can no longer rely on those factual assumptions and because no other state imposes electrocution as its sole method of execution, we will decide the issue under the Nebraska Constitution.

(i) Early U.S. Supreme Court Decisions on Electrocution
In 1890, in In re Kemmler,[101] the U.S. Supreme Court decided the State of New York could proceed with the first execution by electrocution. New York had carried out death sentences by hanging until the governor recommended in 1886 that the Legislature find a less barbarous method.[102] Commercially available electricity was new, and states had not used it for an execution.[103] But after a legislative commission *258 reported in 1888 that electrocution was the most humane and practical method of execution known to modern science,[104] the state enacted electrocution as its mode of execution. William Kemmler, the first prisoner scheduled to die by electrocution, challenged the method as cruel and unusual punishment. He alleged electrocution violated his right to due process under both the state and federal Constitutions.[105]
The trial court concluded that Kemmler had failed to overcome the statute's presumption of constitutionality. It determined that he failed to show "`beyond doubt'" that "`a force of electricity [sufficient] to kill any human subject with celerity and certainty, when scientifically applied, cannot be generated.'"[106] The New York Court of Appeals affirmed. It concluded that the statute's presumption of constitutionality could not be overcome by evidence outside the statute, other than what the court could judicially notice.[107] It therefore "held that the mode ... might be said to be unusual because it was new, but that it could not be assumed to be cruel in the light of that common knowledge which has stamped certain punishments as such."[108] But the Court of Appeals agreed the evidence showed that 1.a current sufficient to produce instantaneous, and therefore painless, death could be applied.[109]
On appeal, the U.S. Supreme Court said that cruel and unusual punishment could not be defined with precision. It stated, however, that certain types of punishment clearly fell within the Eighth Amendment's prohibition: "Punishments are, cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there [is] something inhuman and barbarous, something more than the mere extinguishment of life."[110]
Over the last 118 years, the In re Kemmler standard has remained the baseline criterion under the Eighth Amendment for evaluating a method of execution. The Court did not, however, apply this standard in In re Kemmler to New York's newly enacted method, nor did it independently review the evidence regarding electrocution. Instead, it held that the 8th Amendment's protections were not applicable to state actions through the 14th Amendment: "The decision of the state courts sustaining the validity of [electrocution] under the state constitution is not re[e]xaminable here...."[111] The Court limited the 14th Amendment's protections to the prohibition of "arbitrary deprivation of life; liberty, or property," and "equal protection to all under like circumstances."[112] Under that standard, it concluded the state's new execution method did not violate the prisoner's federal due process rights.[113]
*259 Therefore, the Court did not decide the case under the Eighth Amendment, and there was scant evidence about electrocution in 1890. Yet, lower courts, including this court, have traveled the well-worn path of summarily rejecting claims that electrocution is cruel and unusual punishment. Courts have "typically [relied] on the strength of th[e] Court's opinion in In re Kemmler."[114]
In Malloy v. South Carolina,[115] a 1915 case, the Court held that South Carolina's statutory change from hanging to electrocution did not constitute ex post facto punishment. It concluded that the penalty for murderdeathhad not been increased. Although the Eighth Amendment was not at issue, the Court judicially noticed that 11 other states, including Nebraska, had adopted electrocution after New York did. "[T]his result is the consequent of a well-grounded belief that electrocution is less painful and more humane than hanging."[116] Thus, the Court's reasoning, in part, relied on its factual assumption that electrocution did not increase a condemned prisoner's punishment because electrocution was more humane than hanging.
As in In re Kemmler, the Court in Malloy did not review any evidence underlying that assumption. Instead, it cited its "approval" of electrocution in In re Kemmler and the approval of Massachusetts and New Jersey state courts. Yet, the Massachusetts Supreme Court assumedwithout reviewing evidence regarding the physiological effect of electrocution on the human bodythat electrocution is an instantaneous and painless method of inflicting death.[117] The New Jersey court declined to "assume" electrocution was unconstitutional, and the opinion shows that no evidence was presented on the issue.[118]
In Francis v. Resweber,[119] a 1946 case challenging electrocution, eight justices assumed without deciding that a violation of the 8th Amendment would violate a prisoner's due process rights under the 14th Amendment. The issue was whether Louisiana could conduct a second electrocution after the prisoner's first electrocution failed to result in deathnot whether electrocution was inherently cruel or unusual.
The four-justice plurality concluded: "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely."[120] The prisoner's psychological hardship in facing a second attempt to electrocute him was the result of an unfortunate accident. It did not result in making "his subsequent execution any more cruel in the constitutional sense than any other execution."[121] The four-justice dissent concluded that electrocution is not *260 cruel and unusual punishment when painless and instantaneous: "Electrocution has been approved only in a form that eliminates suffering."[122]
Thus, in Resweber, both the plurality and the dissent concluded that electrocution could be constitutional. However, both the plurality and the dissent again relied on In re Kemmler, in which the Court had refused to apply the Eighth Amendment lend had deferred to the New York Court of Appeals' decision. Resweber left intact the presumption that when properly carried out, electrocution is an instantaneous and painless method of inflicting death.
Our review of these early cases illustrates that the U.S. Supreme Court's case law on electrocution relies on unexamined factual assumptions about an electric current's physiological effects, on a human. This obvious omission in the Court's jurisprudence results from three factors: (1) the Court's limited knowledge about an electrocution's effect on the human body, (2) the states' desire to find a more humane method of execution than hanging, and (3) the Court's view, when electrocution was first introduced, that the Eighth Amendment was not intended as a restraint on state legislatures' determinations of punishment. But that view has changed. The Supreme Court has specifically held that the Eighth Amendment is a restraint on legislative power to impose punishment.[123] And it has held the 8th Amendment applies to the states through the 14th Amendment.[124]
Yet since deciding Resweber in 1946, the U.S. Supreme Court has not addressed the constitutionality of any method of execution,[125] and only indirectly in that case. We agree with Justice Souter that in light of modern knowledge about electrocution, the Court's decisions do not constitute a dispositive response to the issue.[126]

(ii) This Court's Duty to Safeguard Constitutional Rights
It is our duty to protect the constitutional rights afforded under both the federal and state Constitutions.[127] We conclude that we can no longer rely on the factual assumptions implicit in U.S. Supreme Court precedent pertaining to the constitutionality of execution by, electrocution. Because we are now presented with evidence of a nature and quality that the Supreme Court never considered when it held electrocution was not cruel and unusual punishment, we cannot rationally defer to federal precedent.
As discussed, we cannot determine how the U.S. Supreme Court would decide a challenge to electrocution as a method of execution under the federal Constitution if it were presented with this evidence. Bat we note that some of the Court's recent decisions and dissents have called attention to outdated factual assumptions in the Court's precedent.[128] We also know that *261 the Court is highly unlikely to accept an appeal on the issue from any other jurisdiction that has electrocution as an alternative method of execution, The Court has held that a condemned prisoner waives a constitutional challenge to a method of execution if he or she voluntarily selects that method.[129] Only in Nebraska is electrocution the mandated method of execution; there is no alternative.[130]
We reject the dissent's suggestion that we are bound by questionable federal precedent and should allow Mata to attempt a further appeal to the U.S. Supreme Court. It is not our function to predict whether the Supreme Court would grant a writ of certiorari in this case. But it is our duty as constitutional officers to decide the challenge presented in this automatic appeal, based on the record of the case, as tried and decided. And we will not shirk or abdicate our duty to safeguard the constitutional rights afforded by our state Constitution. We conclude that whether electrocution is cruel and unusual punishment is an issue that has fallen to this court to determine.

(b) Legal Standards Defining Cruel and Unusual Punishment
Although we conclude that the Nebraska Constitution governs this issue, because both the federal and state Constitutions prohibit cruel and unusual punishment, we look to federal precedent for guidance regarding general standards to maintain harmony between parallel constitutional provisions.

(i) Substantial Risk That Prisoner Will Suffer Unnecessary and Wanton Pain
The baseline criterion in a challenge to a punishment is whether it imposes torture or a lingering death that is unnecessary to the mere extinguishment of life.[131] "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence" and cruelty inherent in the execution method itself.[132] "[T]he execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself."[133] Capital punishment "must not involve the unnecessary and wanton infliction of pain."[134]
A single accident, however, does not show that a method of execution is inherently cruel.[135] But a pattern of prisoners suffering unnecessary pain presents a different circumstance. A method of execution violates the prohibition against cruel and unusual punishment if there is a substantial foreseeable risk, inherent in the method, that a prisoner will suffer unnecessary pain."[136]
*262 Prisoners are not required to show that their execution will actually result in unnecessary pain. The human body does not respond uniformly to electric current. And, obviously, there are no first-person accounts of an execution that a court can consult.[137] So, courts must necessarily deal with probabilities.[138] The prohibition against cruel and unusual punishment, however, protects prisoners against sufficiently imminent dangers and current infliction of unnecessary pain.[139]
(ii) Evolving Standards of Decency
The State argues the U.S. Supreme Court applies distinct and separate constitutional standards under the Eighth Amendment. It argues that the standard depends upon whether the defendant claims that a punishment is disproportionate or that the method of inflicting the punishment is cruel. The State further argues under this disjunctive scheme that "subjective" standards of decency are mot applicable to method-of-punishment claims. And so, according to the State, the only relevant inquiry is whether the method is cruel or barbarous. The State further claims the "unusual" component is the only relevant inquiry in claims that a punishment is excessive or disproportionate. We disagree with the State's analysis.
The prohibition against cruel and unusual punishment is not a static concept and "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[140] A court must evaluate claims that punishment is cruel and unusual "in the light of contemporary human knowledge."[141]
The State incorrectly asserts that a court's evaluation of contemporary values is subjective. The U.S. Supreme Court looks to objective criteria for this inquiry, the most reliable of which is legislation enacted by this nation's legislatures.[142] We acknowledge that the Court has stated that an excessiveness claim is judged under currently prevailing standards of decency.[143] But it has also considered both cruelty and unusualness when dealing with disproportionality claims.[144] Contrary to the State's argument, the Court has indicated that evolving standards of decency are relevant to methods of execution:
[T]he Court has not confined the prohibition embodied in the Eighth Amendment to "barbarous" methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner. The Court early recognized that "a principle to be vital must be capable of wider application than the mischief which gave it birth." Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Thus, the Clause forbidding "cruel and unusual" punishments "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane *263 justice." Id at 378, 30 S.Ct, 544.[145]
The U.S. Supreme Court has never held that state legislatures' uniform rejection of a method of execution is irrelevant to whether that method is cruel and unusual punishment.[146] It has considered whether a method of execution was unusual in a challenge to execution by firing squad.[147] And in Gregg v. Georgia,[148] the Court rejected a challenge that the death penalty was cruel and unusual punishment under all circumstances. The Court reasoned, in part, that 35 state legislatures had enacted new death penalty statutes to comply with its decision in Furman v. Georgia,[149] which invalidated many states' capital sentencing procedures.[150]
We decline to hold that under the Nebraska Constitution, evolving standards of decency apply only to claims of disproportional punishment. We conclude that evolving standards of decency must apply to claims that the State's intended method of execution inflicts unnecessary and wanton pain. To hold otherwise would not comport with the U.S. Supreme Court's consistent holdings since Furman that the death penalty is different, both in its severity and irrevocability[151] The constitutional prohibition against cruel and unusual punishment would be meaningless if the punishment would have to be rejected by every state before it could be cruel and unusual.[152]
Regarding evolving standards, the evidence showed that by 1949, 26 states had changed their execution method from hanging to electrocution, but that no state had adopted electrocution since. Instead, states began adopting lethal gas as their execution method. By 1973, 12 states were using lethal gas and 20 states were using electrocution. Then, in 1977, lethal injection was introduced.
By 1999, of the 38 states that permitted capital punishment, 34 states offered lethal injection as either a choice or the exclusive method of execution and only four states authorized electrocution as their exclusive method of execution.[153] In 2000, Georgia switched from electrocution to lethal injection as its sole method of execution for capital offenses committed on or after May 1, 2000.[154] Florida also switched in 2000 from electrocution to lethal injection unless the person sentenced to death affirmatively elects electrocution.[155] Finally, in 2002, Alabama followed Florida's lead.[156] Thus, as of July 1, 2002,[157] Nebraska is the only state in the nation to require electrocution as its sole method of execution.
*264 Responding to horror stories of "botched" electrocutions in Florida, some states selected lethal injection).[158] It has been stated that courts have switched to lethal injection "because it is universally recognized as the most humane method of execution, least apt to cause unnecessary pain."[159]
Faced with changing societal values, we cannot ignore Nebraska's status as the last state to retain electrocution as its sole method of execution. But this is not our only consideration. We must also consider whether electrocution comports with the "Eighth Amendment's protection of the dignity of man.'"[160]

(iii) Dignity of Man
"A penalty also must accord with the dignity of man,'" which is the basic concept underlying the prohibition against cruel and unusual punishment.[161] Regarding executions, the four-justice dissent in Resweber stated: "Taking human life by unnecessarily cruel means shocks the most fundamental instincts of civilized man. It should not be possible under the constitutional procedure of a self-governing people."[162] The U.S. Supreme Court has implicitly condemned some punishments as barbaric, such as beheading and drawing and quartering, that inflict unnecessary physical violence.[163] As Justice Brennan stated: "[B]asic notions of human dignity command that the State minimize `mutilation' and `distortion' of the condemned prisoner's body," irrespective of the pain that such violence might inflict.[164] Another jurist has observed:
[W]hile beheading results in a quick, relatively painless death, it entails frank violence ... and mutilation ... and disgrace... and thus is facially cruel. Post-execution disfigurement ... and displaying of the mutilated corpse similarly would be forbidden even though this practice involves no conscious pain.[165]
The Georgia Supreme Court has similarly concluded that conscious suffering cannot be the only consideration in constitutional challenges to a method of execution:
Such a limited focus would lead to the abhorrent situation where a condemned prisoner could be burned at the stake or crucified as long as he or she were rendered incapable by medication of consciously experiencing the pain, even though such punishments have long been recognized as "manifestly cruel and unusual."[166]
We agree that barbarous punishments include those that mutilate the prisoner's body even if they do not cause conscious pain. We conclude that such punishments do not comport with the *265 Eighth Amendment's dignity of man standard.

(iv) No Requirement to Show Legislature Intended to Cause Pain or Lingering Death
The State argues that the prisoner must show that the Legislature intended to inflict unnecessary pain or a lingering death. In the cases it relies on, however, the issue was whether a prisoner must show that prison officials were deliberately indifferent to a risk of pain in an execution protocol. The issue was not whether a state legislature intended the method to cause pain. Even so, the federal courts do not agree whether a plaintiff must show prison officials' deliberate indifference. The Seventh Circuit held that a prisoner must show two things: that there is a significant risk of unnecessary pain during the execution and that prison officials have been deliberately indifferent to that risk in developing an execution protoco[167] We believe however, that the Eighth Circuit stated a stronger rationale for rejecting a subjective intent requirement.[168]
In Taylor v. Crawford,[169] the Eighth Circuit distinguished condition-of-confinement claims from state sanctioned penalties and held that a prisoner does not need to show a prison official's state of mind when the official is carrying out a state sanctioned penalty. In Taylor, Missouri relied on Resweber,[170] It argued that in Resweber, the U.S. Supreme Court held that the prison officials' second attempt at electrocution was not unconstitutional because there was no purpose to inflict unnecessary pain. The Eighth Circuit, however, concluded that an inquiry into state of mind was necessary in Resweber because the second attempt was outside what the statute authorized.
Also, a federal district court similarly reasoned that a prison official's subjective intent is presumptively shown when the pain inflicted is formally meted out as punishment.[171] Relying on U.S. Supreme Court precedent, the court reasoned that a prison official's subjective intent is normally relevant only when the pain inflicted is not meted out as punishment by a statute or sentencing judge. When the official is carrying out an official penalty, however, there is no rationale for requiring the prisoner to show "an additional culpable mental state on behalf of any individual state actors."[172] This reasoning applies even more strongly to state legislatures.
Although the state and federal Constitutions prohibit the "unnecessary and wanton" infliction of pain, we do not believe "wanton" in the context of state sanctioned punishment implies a mental state. In a method of execution challenge, "wanton" means that the method itself is inherently cruel.[173] We believe that if a prisoner were, required to show a legislature's malicious intent in selecting a method of punishment, it is unlikely that courts would ever find any punishment to be unconstitutional. And, undoubtedly, a punishment may be cruel and unusual despite legislative approval.[174]
*266 In Trop v. Dulles,[175] the U.S. Supreme Court held that a statute punishing wartime desertion by forfeiture of citizenship was cruel and unusual punishment. Notably, the Court stated it was not entirely clear that "Congress fully appreciated the fact that [the statute] rendered a convicted deserter stateless."[176] The Court further stated that while Congress had amended the statute to ameliorate its effects, the amendments actually created graver problems by allowing military officials to arbitrarily decide which offenders would be rendered stateless.[177] The Court was unconcerned whether Congress intended to inflict cruel and unusual punishment, and it pointedly recognized that Congress probably did not have this intent. Trop clearly shows that legislative intent to inflict cruel and unusual punishment is not a relevant consideration in a method-of-punishment challenge. Similarly, four justices in Resweber concluded that state officials' lack of intent to cause pain was irrelevant.[178]
Scientific knowledge about electricity and its effects on the human body has vastly expanded since 1913, when the Nebraska Legislature first selected electrocution over hanging.[179] "Time works changes, brings into existence new conditions and purposes."[180] We presume that the Legislature intended to select an execution method within constitutional bounds. But we conclude that whether the Legislature intended to cause pain in selecting a punishment is irrelevant to a constitutional challenge that a statutorily imposed method of punishment violates the prohibition against cruel and unusual punishment.
In sum, we conclude that the relevant legal standards in deciding whether electrocution is cruel and unusual punishment are whether the State's chosen method of execution. (1) presents a substantial risk that a prisoner will suffer unnecessary and wanton pain in an execution, (2) violates the evolving standards of decency that mark a mature society, and (3) minimizes physical violence and mutilation of the prisoner's body. Having established the relevant legal standards, we turn to our standard of review.

(c) Standard of Review

(i) Questions of Law and Fact

This challenge to the constitutionality of electrocution as a method of execution presents a mixed question of law and fact. In constitutional challenges presenting mixed questions of law and fact, we normally review the district court's findings of fact for clear error.[181] Here, however, the constitutional implications involved in any death penalty case require us to independently and scrupulously examine the entire record. In challenges to the constitutionality of a method of execution, we determine whether the trial court's conclusions are supported by substantial evidence.[182] On questions of law, *267 we resolve issues independently of the determination reached by, the court below.[183]
Whether a method of inflicting the death penalty inherently imposes a significant risk of causing pain in an execution is a question of fact.[184] The ultimate issue, whether electrocution violates the constitutional prohibition against cruel and unusual punishment, presents a question of law.[185]

(ii) Deference Due Legislature
Legislatures are not required to select the least severe penalty possible, so long as the penalty selected is not cruelly inhumane or disproportionate to the crime.[186] Regarding statutory punishments, however, on three occasions we have overstated the Legislature's authority under the constitutional prohibition against cruel and unusual punishment. We stated that the constitutional provision preventing cruel and unusual punishment was not intended to abridge the Legislature's power to select such punishment as it deems most effective in the suppression of crime.[187] This statement is clearly too broad. Its roots can be traced to case law preceding the U.S. Supreme Court's application in 1962 of the 8th Amendment to the states through the 14th Amendment.[188] As noted, the Supreme Court has specifically held that "the Eighth Amendment is a restraint upon the exercise of legislative power,"[189] as is the Nebraska Constitution's prohibition against cruel and unusual punishment. More recently, however, we have stated: "`The Legislature determines the nature of the penalty imposed, and so long as that determination is consistent with the Constitution, it will not be disturbed by the courts on review.'"[190]
When we review challenges to criminal statutes, we presume that the statutes are constitutional.[191] And the burden to clearly show that a statute is unconstitutional rests upon the challenger.[192] Yet presumptions can be overcome, and the Legislature cannot establish a method of execution that offends the constitutional guarantee against cruel and unusual punishment.

(d) Parties' Contentions
Mata contends that his challenge to electrocution is not limited to the current protocol, which the Department of Correctional Services adopted in 2004. He argues that electrocution is cruel because it burns and mutilates the body and presents an unnecessary risk of pain. He also argues that electrocution no longer comports with evolving standards of decency because every state thak authorizes the death penalty, *268 except Nebraska, has rejected electrocution.
The State, of course, views the matter differently. The State contends that the district court concluded Mata failed to carry his burden of proof under the appropriate constitutional standard. That argument, however, relies upon a constitutional standard that we have rejecteda requirement that the prisoner show a legislative intent to cause pain and suffering. The State also argues that even if the prisoner remains conscious for 15 to 30 seconds, no basis exists for concluding that electrocution involves unnecessary pain. Finally, the State argues that it is "undisputed that electrocution can and does cause the instantaneous death of a condemned prisoner."[193]
Although Mata contends that his challenge is directed at electrocution and not at the current protocol, an understanding of the current protocol is important because of its similarity to earlier electrocution procedures. We begin by explaining why the protocol was changed in 2004.

(e) Nebraska Statutes Require a Continuous Electric Current but Fail to Specify Its Strength or Force
In 2000, the district court determined, in part, that the State's 1994 electrocution protocol did not comply with § 29-2532 because the current was not continuous. This order was part of the record in Mata I. Section 29-2532 provides in part that "[t]he mode of inflicting the punishment of death, in all cases, shall be by causing to pass through the body of the convicted person a current of electricity of sufficient intensity to cause death; and the application of such current shall be continued until such convicted person is dead." The 1994 protocol required prison officials to apply two 30-second sequences of electric current for a 155-pound person, with a 20-second pause in between shocks. In each sequence, the protocol called for officials to apply 2,450 volts for 8 seconds, followed by 480 volts for 22 seconds. In the 1990's, prison officials applied four sequences of current to electrocute three prisoners.
In response to the district court's order, prison officials changed the protocol in 2004. The new protocol is also standardized to a 155-pound person. But the new protocol requires prison officials to apply 2,450 volts of electric current in one 15-second continuous application.
The exact strength of the current is unknown. The protocol does not specify the amperage, which is the measure of electrical energy in a current. A retired prison administrator who developed the original protocol in the 1980's testified that he had an ammeter installed. He explained that he did this because the risk of fire from the sponges drying out increases if 8 to 10 amperes are applied for too long. He stated that the State uses 6 to 8 amperes and no more than 10. But the executing official for the 1990 electrocutions believed the ammeter simply showed the system was working within the correct range. He did not recall the amperage used or watch the voltage meter during the 1990 electrocutions. During electrocutions, prison officials do not record the amperage or voltage or use a regulator to ensure that the voltage does not drop below the required amount.
The strength of an electric current flowing through a conductor can be calculated if the voltage and a conductor's resistance to a current are known. But as the district court noted, experts do not agree on the human body's resistance as a conductor. Ronald K. Wright, M.D., the *269 certified pathologist who recommended the State's 2004 protocol, testified that it would be unethical for physicians to make these determinations and that states do not measure the voltage exiting a prisoner's body during an electrocution. Because he had to rely on medical journals from the 1890's, he did not know whether a prisoner's size or height would affect the body's resistance. Because there has never been monitoring, the strength of the current flowing through a prisoner's body in Nebraska electrocutions is unknown. This evidence supports the district court's finding that the effect of electric current in a prisoner's body cannot be predicted.

(f) Preparations for Electrocution
Before the execution, the prisoner's head and left leg are shaved where the electrodes will be placed. Both the State and defense experts agree that a high voltage electric current causes the body to violently react with muscle contractions. Shock victims have been known to suffer broken bones and dislocated joints from the force of these contractions. Consequently, officials must tightly strap the prisoner's torso, hips, arms, legs, ankles, and wrists to the electric chair. Witnesses observed prisoners slamming against these straps during an electrocution. Also, officials fasten the prisoner's head to the chair with a wide leather strap across the face, with a cutout for the nose.
After the prisoner is strapped in tightly, officials place a 3¼-inch circular electrode plate on the crown of the prisoner's head and a similar grounding electrode on the prisoner's left calf to create a circuit path through the body. They place larger natural sponges, which have been soaked in a saline solution, under each electrode next to the prisoner's skin. The saline ions form a bridge between the prisoner's body and the electrodes and are intended to keep the electricity from flowing outside the body. Electricity follows ions and will seek the path of least resistance. Wright testified that the sponge must be damp or the sponge and the prisoner may catch on fire.

(g) The Prisoner's Body Is Burned
Burning of the prisoner's body is an inherent part of an electrocution. Wright testified that under the protocol he recommended, there would be burning and the possibility of severe skin burns in the last seconds of the 15-second application. He stated that the prisoner's skin could reach a temperature of 200 degrees. The protocol shows that the State expects burning and keeps a fire extinguisher close by.
During an electrocution, the executing official watches for smoke coming from the prisoner's head or leg. But the executing official for the three electrocutions performed in the 1990's testified that only smoke from the head would require interruption of the current, not smoke from the leg. Further, the protocol requires officials to interrupt the current only for extensive smoke; officials anticipate smoke equivalent to a burning cigar. If flames. appear, the protocol requires officials to stop the current to check the sponges and tighten the electrodes.
Under the, 1994. protocol used during the three 1990 electrocutions, witnesses testified that they saw smoke coming from the prisoner's leg and could smell burning flesh in the viewing room. A media witness of the 1997 electrocution reported seeing Smoke coming from the prisoner's head also. A prison official testified that he had smelled a lingering odor of burning flesh in the death chamber after all three electrocutions. The coroner's reports showed that there were severe ring burns on the prisoners' heads where officials had attached the electrode plate. A witness also testified to viewing a prisoner's body after *270 an electrocution. She reported sagging skin on the sides of the prisoner's head from the temple areas and cheeks to above and behind the ears.
The State concedes that burning is an inherent part of an electrocution but contends that it is localized. The district court, however, found that current density is highest at the electrodes and especially in the left leg. The left leg is where all of the current must pass to exit to the ground electrode. Third-degree burns and charring often appear at the head and left leg electrodes. Defense experts reviewing post mortem photographs of the prisoners concluded the electric current was causing severe burning and charring of the prisoners' left legs from the knee to the foot. In addition, the current vaporizes water in the skin causing severe steam burns and blistering, and leaving the skin in some areas separated and sagging following an electrocution. We disagree with the State's characterization of the burning as localized. The evidence shows that severe burning is also likely to be present under the 2004 protocol.

(h) 2004 Protocol Will Not Eliminate Risk of Prisoner Burning or Catching Fire
In 1994, prison officials changed the protocol to remove medical personnel from execution activities. Also, the 2004 protocol does not require a physician to be present. Under the 2004 protocol, after officials stop the current, they must wait 15 minutes before calling a coroner. The protocol, however, does not specify what officials should do if the coroner finds that a prisoner is still alive. But the warden testified that if a prisoner were alive after 18 minutes, an official would repeat the sequence. The executing official for the 1990 electrocutions also testified that if a prisoner were still alive, an official, after checking the equipment, would repeat the sequence.
Wright admitted that under the 2004 protocol, the sponge could be dry by the time a coroner arrives. He stated that the drying out of the sponge is one reason the current cannot be applied much longer than 15 seconds. He explained that the possibility of a fire is why officials must have a fire extinguisher close. So, by the time a coroner is called, 15 minutes after the current is stopped, if the prisoner is still alive, prison officials will need to replace the sponges before reapplying the current to avoid a fire from a dry sponge. But even if they do this, the risk remains that the prisoner's leg will burn at the exit point because the tissue will have already been deeply burned.
Nebraska used imported executioners to perform electrocutions from 1920 to 1959, and they employed different methods. For example, in 1959, the executioner applied 2,200 volts to the prisoner five separate times. In 1929, however, the State applied 2,300 volts for 19 seconds, which is a similar application to that of the 2004 protocol. Because physicians determined that the prisoner was still alive, officials applied the current again. Heavy brown smoke from the prisoner's burning leg filled the room. This shows the current protocol will continue the mutilation of prisoners' bodies. It also supports the district court's conclusion that some prisoners will be tortured during electrocutions.

(i) District Court Found Some Prisoners Would Experience Unnecessary Pain and Torture
The district court's 2005 order in this appeal illuminates an electrocution's gruesome effects and refutes the State's argument that the court found Mata failed to meet his burden of proof. We summarize the important points.
*271 The court made six specific findings regarding an electric current's physiological effects on humans. First, high voltage causes intolerable pain sensations by direct excitation of peripheral sensory nerves. Second, electricity causes widespread excitation of brain neurons. Third, applying external electricity to the brain can damage brain neurons by interrupting their natural polarity and lead to the loss of neuron function. The court concluded, however, that the loss of function was most critical in the brain stem because those neurons are the most indispensable to respiration and life. Fourth, high voltage causes intense muscle contractions throughout the body, called muscle tetany. The muscles remain locked in full contraction as long as the current is applied. Fifth, high voltage will not cause fibrillation of the heart. Fibrillation is an arrhythmia in which the heart quivers in a chaotic pattern instead of intermittently contracting.[194] Sixth, current flowing through the body will cause thermal heating, known as joule heating. But it is impossible to predict heating in any particular part of the body because of wide variations in the current flow.
The court concluded that it was unknown what path the current would take from the head electrode to the ground electrode on the left leg. It stated that experts sharply disagreed over the mechanism of death in an electrocution. The State's experts believed that electroporation of neurons would cause instantaneous and irreversible loss of brain function. The defense experts believed that the current caused damage to essential organs of the body and that death eventually resulted from the lack of oxygenated blood. The court concluded that the State's theory of instantaneous death assumed a substantial amount of current going to the brain, which was impossible to know. The court observed, "[I]f the state's explanation of the logic of the mechanisms of electrocution and its merit as a means of executing the death penalty are true, it is hard to understand why virtually all of the world has abandoned the practice except for Nebraska."
The court found that the skull would limit how much current went to the brain. Apart from the current's full power exiting the left leg, the court did not believe the current going to other parts of the body, including the brain, could be determined. Such a determination was difficult because the body is a large mass and humans are not predictable conductors. But because the current would result in the frozen contraction of muscles, it found that a prisoner's heart would be unable to pump blood during the application of current. This would starve the brain and other vital organs of oxygenated blood and cause unconsciousness within 15 to 30 seconds.
Nonetheless, the court recognized that hearts frequently restart on their own. It noted that Nebraska's history, and the history of electrocutions overall, showed that one application of current will sometimes not kill a condemned prisoner. "Since it is clear that there is still a pulse or breathing in a number of instances ... it seems equally clear that an inmate could revive and regain consciousness after application of current under the 1980s Nebraska protocol and that' some have revived after protocols used in other cases." It found that whether Nebraska's inmates had regained consciousness and experienced unnecessary pain during an electrocution is unknown. It observed that the State will obviously reapply the current until the prisoner is dead but stated that it was *272 impossible to know which prisoners would require a second jolt.
Because the current's strength and density in different parts of the body could not be predicted, the court concluded that experts for both sides would sometimes be correct about the mechanism of death. The court summed up its own findings and conclusions as follows:
The proposition that judicial electrocutions always result in instantaneous and irreversible brain death with the brain approaching the boiling point is a myth. It is probably the case that some instances of judicial electrocutions do result in instantaneous brain death. It is certainly true that all of them do not.
... Electrocution as a method of executing condemned prisoners is an extremely violent method of accomplishing death. It includes some burning, smoke, and involves extreme contortion of muscles and tissue of almost every part of a person's body. It includes no effort at all to anesthesize the person into unconsciousness before the mechanisms of death are employed.
... The current mode used for an electrocution in Nebraska will result in instantaneous death in some cases, and will almost certainly not result in death at all in some cases. In still others, it will result in a mechanism of death from anoxia with the condemned most likely being unconscious during much of the time it takes to die. It is unknown what the number of cases will be, nor is it possible to, predict which case will have which result. The current mode used for a judicial electrocution is untested ....
....
... [T]here is no question that the Nebraska practice of executing condemned prisoners exclusively by electrocution is unique, outdated, and rejected by virtually Pall the rest of the world; including practices for the euthanasia of non-human animals. There is also no question that its continued use will result in unnecessary pain, suffering, and torture for some, but not all of [the] condemned murderers in this state. Which ones or how many will experience this gruesome form of death and suffer unnecessarily; and which ones will pass with little conscious suffering cannot be known.
Contrary to the State's argument, the court did not find that Mata had failed to meet his burden of proof. Nothing in the evidence or the court's order supports the State's argument that electrocution indisputably results in instantaneous death. The experts clearly dispute this contention. Notwithstanding its findings, the court concluded that it was bound by this court's decisions and must overrule Mata's motion to declare electrocution unconstitutional as a matter of law. Yet, it clearly found that some prisoners would remain conscious for 15 to 30 seconds or during the entire application of the current. It further found it was unknown whether the three Nebraska prisoners electrocuted in the 1990's had regained consciousness during the pauses between sequences. But the court found that some prisoners could revive and have revived and regained consciousness under similar protocols and other protocols. The evidence fully supports those findings and undercuts the State's theory of instantaneous death,

(i) Heart Capable of Restarting

The district court correctly noted that the experts do not agree on how death occurs in an electrocution. All the experts testifying about the effect of a high voltage current on the heart believed that the *273 heart could sometimes beat again after the current was stopped. This is because the heart has built-in, regulators independent of the brain. Only a forensic pathologist for the defense believed that in most cases, a prisoner's heart could not recover its normal rhythm after the current was stopped.
As the district court found, however, physicians have detected heartbeats after the current is stopped  notably in Nebraska's 1929 execution. A physicist for the defense explained that there is a well-recognized range of electrical strengths that will cause fibrillation of the heart. Electric currents with strengths above or below this range will not cause fibrillation, and 2,450 volts is above the range. While the heart will not effectively pump blood during the application of the current, he believed it would almost always recover.
Similarly, Wright, the State's expert, had assisted with a few autopsies after judicial electrocutions and believed the autopsies showed that the prisoners' hearts almost always start beating again. This evidence supports the district court's finding that some prisoners' hearts will beat rhythmically again after the current is stopped.

(ii) State's Theories of Instantaneous Loss of Brain Function
The defense experts disputed the State's theory that prisoners would always lose consciousness. The State's contention that electrocution does not subject prisoners to unnecessary pain depends on Wright's theories: the electric current would cause instantaneous and irreversible electrocution of brain neurons or thermal heating of neurons would reach the point of causing cell death within 4 to 5 seconds. If correct, either theory would mean instantaneous or near-instantaneous loss of brain function and consciousness.
Wright testified that under the Nebraska protocol, irreversible loss of brain functioning would occur within I second, or "the speed of light." He had suggested applying the electric current for 15 seconds to cover any possible variations. He believed the mechanism of death in a judicial electrocution is asphyxiation: The prisoner is unable to breathe because of instantaneous electroporation of neurons. Another State's expert, B.J. Wilder, M.D., a neurologist, also testified that the brain would be instantly depolarized, causing cell death. As the district court explained, electric current can disrupt the natural polarity of neurons. If the electroporation is severe enough and long enough, it causes denaturation of the neurons. Denaturation is a disruption of a cell's protein configuration, which damages the physical properties of the cell's proteins and results in its loss of function. It can be caused by heat or other physical or chemical means.[195] Wright believed a secondary cause of death was joule heating, which would cause the brain to reach a temperature of 110 degrees and to stop functioning within 4 to 5 seconds.
Wright based his theories on a few au. topsies of electrocuted prisoners in which he had assisted. His theory also relied on temperature, recordings of prisoners' cerebrums alter their electrocutions in Florida. The cerebrum is the main two-hemisphere portion of the brain in the upper part of the cranial cavity.[196] Wright had recorded the brain temperatures of between 6 and 12 prisoners between 1977 and 1993. The bodies had been removed from the prison to a location about V/2 hours away before the brain temperatures *274 were taken. Wright did not have specific data, but he remembered that many temperatures were around 98 to 100 degrees and that one temperature had been as high as 112 degrees.
Wright stated that he knew the brains had denatured because normally they have the consistency of gelatin but they had firmed up. He testified that there is no microscopic evidence that neurons have denatured due to thermal heating or depolarization because the heating is not high enough to cause observable post mortem changes. He did not report discoloration of brain tissue and specifically stated that the brain looked normal.
(iii) Defense Experts Reject State's Theories
The defense experts who disputed Wright's theories included Thomas L. Bennett, M.D., a forensic pathologist; Donald D. Price, Ph.D., a neurophysicist; and John P. Wikswo, Jr., Ph.D., a physicist who had studied the effects of electrical injury. They rejected Wright's theories of instantaneous depolarization and denaturation of neurons because they believed he based his theories on an assumption that all of the current enters the brain.
Wright admitted that he based his calculation of thermal heating of the brain on his belief that all of the current enters the brain. He also admitted that",a significant delay had occurred before anyone took the brain temperatures he had recorded and that he did not know the ambient temperatures during the delay. Finally, he admitted that Florida applied current to prisoners for almost twice as long ELS Nebraska's 2004 protocol requires and that many of the temperatures were around 98 to 100 degrees.
The defense experts believed that only 5 to 10 percent of the electric current, and possibly as little as 2 percent of the current, would pass through the skull to the brain. They explained that because the skull is a poor conductor of electricity, it will shunt the current away from the brain. That is, the path of least resistance is around the prisoner's head.
They believed that cell death is a process and that instantaneous loss of brain function was highly unlikely. They also believed that the deeper parts of the brain controlling consciousness and respiration could function even if some parts are damaged. They testified that after an electrocution, there is no medical evidence of massive damage in the brain, which would indicate instantaneous death, or total loss of neuron function. Although there are other pathways through which an electric current could enter the brain  e.g., veins and nerves  Wikswo did not believe that the current would follow those pathways in a judicial electrocution. He explained that the grounding electrode on the prisoner's leg would generally cause the current to move from the top down.
Several physical observations supported these opinions. For example, most of the physical damage is on the outside of the body. The burn rings frequently noted on prisoners' heads show that the electric current arcs around the sponge and moves out from the' electrode radially around the head. If the current were going straight down, there would be a burn disk. Bennett reviewed photographs of all three prisoners electrocuted in Nebraska during the 1990's. He noted that the burning on one prisoner's scalp was consistent with arcing from the sponge and the skin's resistance to current. He believed that the circular burning on the sides of another prisoner's head showed the current  following the path of least resistance  had gone down the sides of his scalp to his neck and body. Similarly, Wikswo noted that in a judicial electrocution in Nebraska, a burn on the side of a prisoner's neck *275 showed that the current had gone around the outside of, his head and entered his body at the neck:
In addition, Wikswo and Price had reviewed autopsy reports from other states and testified that there was no evidence of massive damage of prisoners' brains and only isolated spots of denaturation in those brains. Price disagreed with Wright that there is no microscopic evidence of denaturation. He had deliberately denatured cells and observed the structural disorganization caused by the breakdown of protein. He testified that microscopic observation of brain sections from electrocuted prisoners showed no signs of denaturation. Regarding Wright's testimony that the brains of electrocuted prisoners were "firmed up," Bennett testified that denaturation, of the brain is a process that continues after death so that findings in an autopsy do not necessarily reflect the brain's condition at death.
In contrast to Wright's testimony, Wikswo testified that the primary indication of thermal denaturation of brain tissue is discoloration. Reports of isolated spots showing denaturation could have been caused by secondary heating of the skull under the electrode or by the current passing through the skull. But if a significant amount of the current was entering the brain, Wikswo and Price testified that, they would have expected to see more damage to other parts of the brain. Instead, other parts of the brain showed no discoloration. Price testified that the isolated spots indicated that the current, which did enter the brain, was not uniform.
Although the experts disputed much of the physical evidence regarding denaturation, the strongest physical evidence that undercuts Wright's theories of total loss of brain function are signs of respiration.
Defense experts explained that parts of the brain located in the brain stem and extending up to the midbrain area control respiration and consciousness. These areas are deep within the brain, away from the skull where the electrode plate is attached. These areas of the brain are also the most resilient. Because consciousness and respiratory control centers are in close proximity, if a prisoner is still breathing after the current is stopped, then it is likely that neither area has been depolarized to the point of incapacity. Bennett explained that even if electroporation had injured neuron cells to the point that they will die, the effect is like a bad bum to a body. The person does not die immediately but dies as the effects keep overwhelming the person's ability to recover. He stated that even after prolonged exposure to high voltage, persons still have brain function; they do not die immediately.
Regarding loss of brain function, Wright testified that the best indication of brain death was whether a person can breathe unassisted. Yet, he admitted that if a prisoner were still breathing, it indicated significantly less current had passed through the brain than he had predicted. Also, he admitted that evidence of respiration could not be reconciled with his theory that the brain instantly stops functioning. Finally, he admitted that if the prisoner were still able' to breathe after the current were stopped, the prisoner could obtain more brain function and even possibly survive.

(iv) Evidence Shows Some Prisoners Still Alive

The State does not conduct autopsies of electrocuted; prisoners to review the effects of electric current on the body or the condition of internal organs. But physicians were present at all of the electrocutions in Nebraska before 1994 and checked prisoners for signs of life. Nebraska electrocuted 15 men from 1920 to 1997. There are obviously no longer witnesses of the *276 early executions, so we refer to newspaper accounts in those cases that are part of this record. The evidence shows that in three known executions, or 20 percent of the total, physicians or eyewitnesses reported that the prisoner was still breathing or alive after the initial application of current. The most dramatic account of a prisoner's being alive after the current was stopped involved almost the same voltage and length as are provided for in the 2004 protocol.
In the 1929 electrocution discussed above, the executioner applied a current with 15 amperes and 2,300 volts for 19 seconds. After officials removed the straps, the physicians examined the prisoner. During the second physician's examination, the prisoner's chest moved, and "[c]onvulsive heaving of the youth's chest and a deep throaty rattle soon gave evidence that [the prisoner] was still breathing." This movement continued at intervals that became shorter and shorter, followed by a throaty rattle "like a deep snore" that also continued at intervals. The physicians again listened for his heartbeat and signaled to the executioner to reapply the current.
Furthermore, the evidence indicates that in the 1994 electrocution, the State applied 2,450 volts for 17 seconds and that the prisoner was still breathing afterward. As noted, the 1994 protocol required prison officials to apply two sequences of current: 2,450 volts for 8 seconds, followed by 480 volts for 22 seconds. However, the prison administrator who developed the 1994 protocol testified that; in 1994, he recommended officials apply the 2,450-volt current for 17 seconds instead of 8 seconds in the first sequence, because the prisoner weighed 212 pounds. He believed his recommendation was accepted. No other testimony refutes or confirms this alteration. But if true, in 1994, the State had to apply 2,450 volts for 2 seconds longer than the 15 seconds required by the 2004 protocol. An eyewitness testified that the prisoner appeared to be breathing after the executioner stopped the initial current and that she heard him make a low guttural growl near the end of the second jolt.
As the district court noted, Nebraska is not unique in reports of prisoners breathing after the current is stopped. A defense expert, who had extensively reviewed eyewitness accounts of electrocutions in other states, testified that prisoners occasionally show signs of consciousness during an electrocution. For example, he stated that a second application of current was required in 15 percent of the electrocutions conducted in Virginia. He had also reviewed 15 narrated audiotapes of judicial electrocutions in Georgia. In two cases, there were signs of consciousness. One prisoner had a nervous tic and was bobbing his head when he was led into the death chamber. After the first current sequence, the officials noted that he was still breathing and then started to bob his head again.
Similarly, defense experts testified that many reports exist of prisoners still breathing after the current is stopped. They also pointed out there are many examples of high voltage shock victims who survived. Those victims reported remaining conscious throughout the shock, even when their head is the point of contact with a high voltage current. Bennett testified that individuals had retained full consciousness about 50 percent of the time. Persons who survived these shocks reported excruciating pain. Defense experts do not believe that prisoners are rendered instantly unconscious in a judicial electrocution and that they suffer, similarly while conscious.

*277 (v) Sources of Pain in an Electrocution

Obviously, a conscious prisoner would suffer excruciating pain from the electrical burning that is occurring in the body. But defense experts explained that there are other ways a high voltage current causes pain. Price had extensively researched pain mechanisms in the brain. He explained that the electric current that did enter the brain would excite multiple areas in the brain known to cause pain when electrically stimulated. Also, alternating current, which alternates in polarity 60 times per second and is used in electrocutions, is known to repetitively excite nerve tissue. Price also testified that a prisoner would experience extreme air hunger because the prisoner cannot breathe while his or her diaphragm is rigidly contracted.
Bennett testified that he did not believe a prisoner's thalamus, which is the sensory relay center in the midbrain area, is completely destroyed in an electrocution; thus, a prisoner experiences extreme pain and suffering from electrical stimulation of sensory nerves in the skin and muscles. He explained that the skin is rich in nerve fibers with skin receptors that send messages to the brain when stimulated. Wikswo explained that the brain could not distinguish between different types of stimulations of pain receptors in the body or skin. Muscles also have pain receptors, so the violent contractions of muscles throughout the body would be painful. In addition, the heart's contraction is like the pain of a heart attack.
Wright admitted that when an electric current passes through the body from hand to hand, shock victims who suffer depolarization in their joints do not instantly lose functioning in their arms and hands and still feel intense pain. Further, his admissions during cross-examination bolster the defense experts' opinions that this type of conscious suffering is possible.

(vi) Evidence Supports Court's Finding That Some Prisoners Will Experience Unnecessary Pain, Suffering, and Torture
This evidence substantially supports the district court's conclusion that electrocution "will result in unnecessary pain, suffering, and torture" for some condemned prisoners. Contrary to the State's argument, there is abundant evidence that prisoners sometimes will retain enough brain functioning to consciously suffer the torture high voltage electric current inflicts on a human body. The evidence supports the district court's statement that instantaneous and irreversible brain death is a myth. As Wright admitted, "[i]f you reduce the amount of current or, you interpose something with a high resistance in that same pathway, then you will create an implement of torture." According to the evidence, that "something" in some cases is the prisoner's skull.
The evidence also supports the district court's statement that the evidence shows one application of current will not always kill a prisoner. And sometimes, a prisoner will die more slowly from oxygen deprivation and damage to the body's vital organs. The State's expert admitted that a prisoner who can breathe could survive and regain more brain function, even assuming that the prisoner lost total consciousness during the application of the current. No one knows how long a prisoner could languish in agony, attempting to breathe, while the State passively waits to see if he or she dies.
This evidence shows that death and loss of consciousness is not instantaneous for many condemned prisoners. Far from the assumption in early U.S. Supreme Court decisions that "[e]lectrocution has been approved only in a form that eliminates suffering,[197] *278 the evidence here shows that electrocution inflicts intense pain and agonizing suffering. The record supports the district court's statement that no expert could predict with certainty the result for any particular condemned prisoner. But certainty is not required. The standard is whether the punishment creates a substantial risk that a prisoner will suffer unnecessary and wanton pain in an execution.
We reject the State's argument that electrocution would not be cruel and unusual punishment if a prisoner remained conscious for 15 to 30 seconds. Fifteen to thirty seconds is not a blink in time when a human being is electrically on fire. We reject the State's argument that this is a permissible length of time to inflict gruesome pain. It is akin to arguing that burning a prisoner at the stake would be acceptable if we could be assured that smoke inhalation would render him unconscious within 15 to 30 seconds.
Given the evidence and the district court's finding thereon, we conclude that electrocution will unquestionably inflict intolerable pain unnecessary to cause death in enough executions so as to present a substantial risk that any prisoner will suffer unnecessary and wanton pain in a judicial execution by electrocution.

(j) Conclusion: Electrocution Is Cruel and Unusual Punishment
Besides presenting a substantial risk of unnecessary pain, we conclude that electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation of the prisoner's body. Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity, of man. Other states have recognized that early assumptions about an instantaneous and painless death were simply incorrect and that there are more humane methods of carrying out the death penalty. Examined under modern scientific knowledge, "[electrocution] has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber" of state prisons.[198] We conclude that death by electrocution as provided in § 29-2532 violates the prohibition against cruel and unusual punishment in Neb. Const. art. I, § 9.

(k) Resolution
Having concluded that electrocution is cruel and unusual punishment, we face the question of how to dispose of this appeal. The fact remains that although the Nebraska statutes currently provide no constitutionally acceptable means of executing Mata, he was properly convicted of first degree murder and sentenced to death in accord with Nebraska law. We have already affirmed his conviction.[199] His sentence of death, although it cannot be implemented under current law, also remains valid.
Under Nebraska law, the sentencing panel can fix the sentence either at death or at life imprisonment.[200] Because a panel's sentencing authority does not extend beyond that, the method of imposing a death sentence is not an essential *279 part of the sentence.[201] And Nebraska's statutes specifying electrocution as the mode of inflicting the death penalty are separate, and severable, from the procedures by which the trial court sentences the defendant.[202] In short, that a method of execution is cruel and unusual punishment "`bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself.'"[203] Because we find no error in imposing a sentence of death, we affirm the district court's judgment.
On direct appeal in a capital case, our responsibility extends beyond the validity of the conviction and sentence. We are also charged with the duty to administer and supervise the implementation of the death penalty by appointing the day for execution of the sentence and issuing a death warrant.[204] It is in exercising that duty that we have considered whether electrocution is constitutional.[205] And obviously, the State cannot carry out Mata's sentence without a constitutionally acceptable method of execution.
Thus, although we affirm the judgment, we decline to "appoint a day certain for the execution of the sentence"[206] and stay Mata's execution.[207] When the State moves that an execution date be set, in addition to the other requirements for such a motion,[208] the State should allege, and be prepared to demonstrate, that a constitutionally acceptable method of carrying out Mata's sentence is available.

VI. CONCLUSION
Mata's sentence of death is affirmed. But under our system of government, while the Legislature may vote to have the death penalty, it must not create one that offends constitutional rights. We recognize the temptation to make the prisoner suffer, just as the prisoner made an innocent victim suffer. But it is the hallmark of a civilized society that we punish cruelty without practicing it. Condemned prisoners must not be tortured to death, regardless of their crimes.
And the evidence clearly proves that unconsciousness and death are not instantaneous for many condemned prisoners. These prisoners will, when electrocuted, consciously suffer the torture that high voltage electric current inflicts on the human body. The evidence shows that electrocution inflicts intense pain and agonizing suffering. Therefore, electrocution as a method of execution is cruel and unusual punishment in violation of the Nebraska Constitution, article I, § 9. And, without a *280 constitutionally acceptable method of execution, Mata's sentence of death is stayed.
SENTENCE AFFIRMED, AND EXECUTION STAYED,
HEAVICAN, C.J., concurring in part, and in part dissenting.
Although I agree with the first seven parts of the majority's analysis, I respectfully dissent from the majority's conclusion that electrocution  a means of execution used in America for well over a century  is no longer constitutional. I therefore write separately to not only voice my dissent from that conclusion, but also to express sincere reservations with several aspects of the analysis used to generate it.

I.
Early in its analysis, the majority acknowledges that the U.S. Supreme Court has indicated electrocution is not cruel and unusual. Accordingly, the majority concedes that it has no authority to hold that electrocution violates the Eighth Amendment. But as it is this court's "duty to safeguard our state Constitution," the majority purports to resolve whether "electrocution is prohibited by the Nebraska Constitution's proscription against inflicting cruel and unusual punishment." After a lengthy analysis, the majority concludes that electrocution is, fact, a violation of the Nebraska Constitution.
The concern, of course, is that we have long held that our constitution's cruel-andunusual-punishment provision is no more stringent than is the Eighth Amendment to the federal Constitution.[1] Thus, if the Nebraska Constitution does not require anything more than the federal Constitution regarding cruel and unusual punishment, and the U.S. Supreme Court has indicated that electrocution is not cruel and unusual under the federal Constitution, I cannot see how electrocution violates the Nebraska Constitution.

A.
Conceivably, the majority could have reached its result by merely overruling the cases which established the similarity between the Nebraska and federal Constitutions. However, the majority's opinion lacks any such declaration. I trust that if the majority intended such a sweeping change in our constitutional doctrine, it would have done so explicitly.
Moreover, even if the majority had held that the Nebraska Constitution requires more than the federal Constitution, such a position would be difficult to defend. As the majority acknowledges, the cruel-andunusual-punishment provision in article I, § 9, of the Nebraska Constitution contains the exact same language as that found in the Eighth Amendment. Both provisions provide that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments] inflicted."[2] Of course, it would be exceedingly difficult  and perhaps a touch disingenuous  to insist that identical language has two different meanings.
It should be indisputable that either the Nebraska Constitution is a mirror of the Eighth Amendment, in which case U.S. Supreme Court precedent is conclusive, or that the Nebraska Constitution requires more than the Eighth Amendment, in which case this court would not be bound *281 by U.S. Supreme Court case law. By contradicting U.S. Supreme Court precedent and yet declining to say that article I, § 9, is any different than the Eighth Amendment, the majority has left us in a sort of constitutional limbo: Our state's constitutional limit on cruel and unusual punishment is not quite like the federal Constitution, yet not quite distinct from it either.
The confusion surrounding the majority's constitutional analysis is heightened when the majority relies on "federal precedent for guidance" on this issue. The numerous subsequent cites to federal case law confirm that the majority retained federal court approaches to this Eighth Amendment question, yet jettisoned the U.S. Supreme Court's ultimate answer. In other words, the majority relied upon those aspects of federal law that supported its conclusion and ignored the remainder that did not.

B.
Indeed, the unmistakable tone of the majority opinion is that In re Kemmler[3]  the U.S. Supreme Court decision most often cited as support for the constitutionality of electrocution  is an anachronism. The majority relies upon the dissent to Glass v. Louisiana,[4] in which Justice Brennan expresses the belief that In re Kemmler "was grounded on a number of constitutional premises that have long since been rejected and on factual assumptions that appear not to have withstood the test of experience." Accordingly, Justice Brennan  and, indeed, the majority here  regards In re Kemmler as "antiquated authority."[5]
Not long after expressing such sentiment, the majority points out that, Nebraska is the only state that mandates electrocution and that the U.S. Supreme Court will almost certainly not "accept an appeal on the issue from any other jurisdiction." As such, the majority feels an ultimate determination as to the constitutionality of electrocution "has fallen to this court,"
These comments suggest the majority believes that by striking down electrocution under the Nebraska Constitution, it is doing what the modern U.S. Supreme Court would do under the Eighth Amendment if it, too, were "presented with evidence of a nature and quality that the Supreme Court never considered when it held electrocution was not cruel and unusual punishment." This would explain the majority's decision to resolve this case under article I, § 9, of the Nebraska Constitution  a move that obviates the need to defer to "antiquated" U.S. Supreme Court authority  yet nonetheless rely entirely on federal Eighth Amendment precedent.
Of course, if the majority were truly confident that it is not doing anything the U.S. Supreme Court itself would not do today, it would not have been necessary to draw the Nebraska Constitution into the question. Instead, the majority could have simply emphasized In re Kemmler's antiquity, highlighted the uniqueness of this factual record, and then expressed that it wished it could  but was unable to  reach a different result.[6] This would have given the U.S. Supreme Court the opportunity to *282 grant certiorari and overrule precedent the majority believes is so clearly outdated. Instead, the majority chooses to essentially retain the Eighth Amendment's proscriptions but avoids the problem of having to overrule a U.S. Supreme Court decision by purporting to reach its result under the Nebraska Constitution.
While this approach may serve the majority's purpose, I believe it does so at the expense of clarity in our constitutional doctrine. Before today's decision, lower courts could rest with confidence on the belief that our constitution requires nothing more than the Eighth Amendment with regard to methods of punishment. By reaching a conclusion that contradicts U.S. Supreme Court precedent, this decision will give lower courts reason to question that belief. At a minimum, attorneys may exploit the ambiguity in today's decision in subsequent cases.

C.
Given the majority's reliance on the Nebraska Constitution, there may be speculation that today's decision is immune from certiorari review. If true, the majority's decision would conclusively resolve the constitutionality of electrocution because, as the last state that mandates electrocution, the U.S. Supreme Cotht could only address the constitutionality of execution on an appeal from this court., For reasons set forth below, I am of the belief that today's decision is not immune from certiorari review despite the majority's references to the Nebraska Constitution.
It is well settled that the US. Supreme Court is precluded from hearing' an appeal from a state's highest court where that court's decision was the product of state law  statutory or constitutional.[7] This rule of independent and; adequate state grounds reflects the principle that state courts are the final arbiters of their own laws.[8] In such cases, it would be superfluous, and thus a violation of Article Ill's proscription against advisory opinions, for the Court to resolve any remaining federal issues.[9] The question, however, is how to identify whether a state court's decision truly rests on independent and adequate state grounds. The Court addressed this very question in Michigan v. Long.[10]
At issue in Long was whether a police officer could conduct a protective search of the passenger compartment of an automobile that had been lawfully stopped. Citing its state constitution, the Fourth Amendment, and federal case law, the Michigan Supreme Court concluded that such a search was illegal. The U.S. Supreme Court granted certiorari. Before addressing the merits of the case, the respondent argued that the U.S. Supreme Court did not have jurisdiction to hear the case because the Michigan Supreme Court's decision was based on the Michigan Constitution and thus had an independent and adequate state ground.
In response to that argument, the U.S. Supreme Court announced that when
a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the *283 case the way it did because it believed that federal law required it to do so.[11]
The rationale is that when a state court construes state law in light of federal authorities, "[t]he state ground is not really `independent' of the federal ground."[12] In that case, "the U.S. Supreme Court may review because the state court may have misapprehended federal law."[13]
Applying its rule to the case before it, the U.S. Supreme Court in Long concluded that the Michigan Supreme Court's decision did not rest oh independent and adequate state grounds. The Court noted that "[a]part from its two citations to the State Constitution, the [Michigan Supreme Court] relied exclusively on its understanding of ... federal cases."[14] Moreover, the Court observed that "[n]ot a single state case was cited to support the state court's holding that the search of the passenger compartment was unconstitutional."[15]
The same is true of the majority's opinion in this case. Although the majority refers to the Nebraska Constitution, it fails to cite to a single Nebraska case in support of its conclusion that electrocution is unconstitutional. The entirety of the majority's analysis is based on cites to federal case law. Indeed, the majority itself conceded that it "look[ed] to federal precedent for guidance" in deciding this issue. Under Long, such reliance suggests that the majority's decision is without an independent state ground.
The majority's assertion that "the Nebraska Constitution governs this issue" does not at all diminish this fact. First, the majority never declares that the Nebraska Constitution is more restrictive than the Eighth Amendment. But even if it had, that alone would almost certainly not have been enough to overcome the effect of the majority's reliance on federal case law in light of Long: "Even if we accept that the Michigan Constitution has been interpreted to provide independent protection for certain rights also secured under the Fourth Amendment, it fairly appears in this case that the Michigan Supreme Court rested its decision primarily on federal law."[16] As a result, the majority's "references to the State Constitution in no way indicate that the decision below rested on grounds in any way independent from the state court's interpretation of federal law."[17]

II.
I am also hesitant about the majority's conclusion that "[a] method of execution violates the prohibition against cruel and avunusual punishment if there is a substantial foreseeable risk, inherent in the method, that a prisoner will suffer unnecessary pain." My concerns with this standard are twofold.
First, I note that in numerous cases, the U.S. Supreme Court has held that capital punishment "must not involve the unnecessary *284 and wanton infliction of pain."[18] Yet in a subtle shift, the majority dropped the words "and wanton" from its standard so that it speaks only to an unnecessary infliction of pain. The result is that a prisoner need not show any culpability on the part of the government to invalidate a method of execution.
In justifying the decision to omit "and wanton" from the opinion, the majority explained that it does "not believe `wanton' in the context of state sanctioned punishment implies a mental state." Rather, the majority believes that the U.S. Supreme Court's use of "wanton" was superfluous and simply another way of saying "inherently cruel." Accordingly, the majority concludes that a "legislative intent to inflict cruel and unusual punishment is not a relevant consideration in a method-of-punishment challenge." As support for this conclusion, the majority relies on the Supreme Court's opinions in Trop v. Dulles[19] and Francis v. Resweber.[20] I believe the majority's reliance is misplaced.
Trop dealt with the constitutionality of a statute which officially divested wartime deserters of their status as American citizens. But only four justices  Chief Justice Warren and Justices Black, Douglas, and Whittaker  addressed the statute's constitutionality under the Eighth Amendment. Justice Brennan, writing separately, found that the law exceeded Congress' authority "to raise and maintain military forces to wage war."[21] Consequently, Justice Brennan never addressed the statute's constitutionality under the Eighth Amendment and does not provide a fifth vote for the plurality's, Eighth Amendment analysis. Therefore, to the extent that Trop does, in fact, show that a legislative intent to inflict pain is irrelevant in assessing the cruelty of a punishment, that premise would be one without majority support.
Much the same can be said of Resweber. As the majority readily concedes, Resweber was also" a four justice plurality decision. In fact, rather than standing for the proposition that "state officials* lack of intent to cause pain was irrelevant" Resweber arguably suggests the opposite. The plurality's conclusion that what transpired in Louisiana was not cruel or unusual was based, at least in part, on the fact that "[t]here [wa]s no purpose to inflict unnecessary pain ...." attributable to the government.[22] At a minimum, Trop and Resweber show that the idea that a lack of intent to inflict pain is irrelevant in the cruel-and-unusual-punishment analysis is an idea that has never received majority support from the U.S. Supreme Court at any given time.
Instead of Trop or Resweber, I would point to the U.S. Supreme Court's more recent decision in Wilson v. Seiter[23] to help resolve this issue. In Wilson, a majority of the Supreme Court reemphasized that "only the `unnecessary and wanton infliction of pain' implicates the Eighth *285 Amendment."[24] Accordingly, the Court held that "a prisoner advancing such a claim must, at a minimum, allege `deliberate indifference'" because "`[i]t is only such indifference' that can violate the Eighth Amendment ...,"[25] I think the Court's statements in Wilson are sufficiently clear to conclude that "wanton" as used in the Eighth Amendment standard is not superfluous but actually requires at least deliberate indifference, if not outright intent, on the part of the government.
My second concern with the majority's formulation is that when used independently, the word "unnecessary" creates "too much leeway for a court to declare one method of execution unconstitutional merely because it found another was better."[26] If the majority's use of "unnecessary" is strictly construed, even an extremely small amount of discomfort would be "unnecessary" if some other method  even one far more costly and burdensome  resulted in no pain at all.
A simple hypothetical illustrates this point. Suppose that tomorrow a skin patch is developed which, when applied to an inmate's arm, results in as quick and painless a death as lethal injection now offers. As compared to the skin patch, all the discomfort associated with the injection process  bracing the prisoner's arm, attaching the intravenous bracket, fumbling for a vein, and of course, inserting the needle  would technically be "unnecessary." As a result, lethal injection would be unconstitutional under the majority's standard.
It seems, therefore, that a standard which prohibits the use of "unnecessary pain" is really a standard which demands the least painful method. It is beyond dispute, however, that neither the Eighth Amendment nor the Nebraska Constitution requires the least painful method of execution; those provisions prohibit only the use of cruel and unusual methods.[27] This is evident from the structure and language of the constitutional provisions themselves. Had those provisions been intended to require the least painful method of execution, they would have been written as directives, not limitations.
Whether or not a least-painful standard was the majority's intent, its formulation is open to such an interpretation. To avoid this pitfall, I would refrain from using the phrase "unnecessary pain" as the guiding principal in the analysis. Rather, I believe prior references to "unnecessary pain" refer to methods of execution that are "manifestly cruel and unusual,"[28] such as those involving torture, a lingering death,[29] or other hallmarks of a "purpose to inflict unnecessary pain."[30] Relying upon the discussion of deliberate indifference from above, one way such a standard might be formulated is to say that constitutional bans on cruel and unusual punishment prohibit "deliberate indifference to an unreasonable risk of severe and prolonged *286 pain in execution,[31] While this may not be an ideal standard, at a minimum, such language would avoid the confusion inherent in the majority's formulation and, in my view, move us closer to the Eighth Amendment's true proscriptions.

III.
Having detailed several concerns with the majority's opinion, I come now to what I believe is its most troublesome aspect: reliance on so-called evolving standards of decency.
The concern with evolving standards of decency in the cruel-and-unusual-punishment context can be traced back to the plurality opinion in Trop.[32] There, a plurality of the Court remarked that the Constitution prohibits punishments that run contrary to the "evolving standards of decency that mark the progress of a maturing society."[33] n At least initially, the primary indicia of changes in societal standards were "statutes passed by society's elected representatives."[34]
It is true that electrocution has fallen into disfavor among American jurisdictions. Nebraska is the only jurisdiction that retains the electric chair as the sole method of execution and is one of a handful of states that uses the electric chair at all. Even so, it is not necessarily true that the movement away from electrocution has been uniformly precipitated by concerns regarding decency. It may be, for example, that states widely favor lethal injection over electrocution simply because lethal injection is a more practical method of terminating a life.
There is also reason to believe that "[t]he nationwide change to lethal injection was motivated at least as much by a desire to end the litigation over the previous methods [of execution] and the attendant delays as it was by the actual desire to abandon the old methods [themselves]."[35] For example, there is evidence that the change from cyanide gas to lethal injection in California was prompted not by humanitarian concerns, but, rather, to avoid protracted and costly legal challenges to the use of cyanide gas by death row inmates.[36] It is tempting to speculate that Florida's legislature may have been motivated by similar concerns when it changed from electrocution to lethal injection after the U'S. Supreme Court agreed to review the Florida Supreme Court decision upholding electrocution.[37] But even if the trend away from electrocution could be explained solely on the basis of humanitarian concerns, I would still not be convinced that such a concern should factor into our constitutional analysis.

A.
The most significant difficulty with a concern for contemporary standards is that it inherently tempts judges to inject their own subjective values into the constitutional analysis. The danger in such subjectivity *287 is subtle but nonetheless potent. Judges do not sit as a body of elected representatives, as do legislatures. While this distinction provides a degree of independence necessary for judges to make the unpopular decisions that a neutral reading of the law sometimes compels,[38] it also renders courts ill suited "to respond to the will and consequently the moral values of the people."[39]
Although some may view the Constitution as an invitation to "our judges, to expand on the ... freedoms that are uniquely our heritage,"[40] this view somewhat naively assumes that judges will always seek to "expand" rather than constrict liberties. If left free to supplant their own values on the cases before them, judges may just as easily seek to limit individual rights as expand them. This, of course, is to say nothing of the fact that a true expansion of rights is a practical impossibility. It is often the case that an expansion of rights for one group results in a loss of rights for others.[41] In this way, subjective judicial decisionmaking paves "a two-way street that handles traffic both to and from individual rights"[42] and therefore presents a danger to any and all ideologies.
The majority downplays the concern that "a court's evaluation of contemporary values is subjective" by pointing out that the U.S. Supreme Court looks only "to objective criteria for this inquiry." However, one can argue that recent Supreme Court history confirms that even courts which initially intend to keep the inquiry into evolving standards truly objective will inevitably allow subjective value judgments to creep into the analysis.
In Stanford v. Kentucky,[43] the U.S. Supreme Court addressed whether executing individuals older than 16, but younger than 18 constituted cruel and unusual punishment. In the course of holding that such executions were not cruel and unusual, a four-member plurality observed that a court's role under the Eighth Amendment "is to identify the `evolving standard of decency'; to determine, not what they should be, but what they are."[44] As a result, the plurality held that an evaluation of contemporary standards should be based solely on the objective reality of legislative pronouncements, not "the preferences of a majority of this Court."[45]
A fifth justice, Justice O'Connor, essentially agreed with this premise, yet wrote separately to emphasize her belief that a court's own judgment is relevant when determining "whether the `nexus between the punishment imposed and the defendant's blameworthiness' is proportional."[46] Proportionality analysis is irrelevant when *288 assessing the majority of Eighth Amendment issues,[47] including the constitutionality of a method of execution as opposed to the propriety of a death sentence itself Therefore, for all practical purposes, Justice O'Connor added a fifth vote in support of the notion that a court's own judgment had no place in most Eighth Amendment debates.
But when the U.S. Supreme Court revisited the issue some 15 years later in Roper v. Simmon,[48] it held that the ultimate "task of interpreting the Eighth Amendment remains our responsibility."[49] On that basis, the Court held that executing minors offended conventional standards of decency.[50] Juxtaposing Stanford and Roper shows that even courts which initially set out with intent to objectively identify what conventional standards of decency are, will likely succumb to the ever-present temptation to subjectively say what those conventional standards should be. There is no doubt that the temptation for judges to inject subjective values into their decisions is always present. But assigning weight to conventional standards of decency does not merely open the door to subjectivity; it invites it.

B.
There is also the possibility that concern for contemporary standards of decency will eventually lead courts to rely on foreign law. In Stanford, a majority of the Court emphasized that only "American conceptions of decency are dispositive"[51] and therefore rejected the contention that "sentencing practices of other countries... serve to establish ... that the practice is accepted among our people."[52] But in Roper, the majority openly cited a number of foreign laws and ultimately gave weight to the fact that "the United States now stands alone in a world that has turned its face against the juvenile death penalty."[53]
Such an observation may well be true, but I do not believe it is relevant to our analysis. I agree that a legislature assessing the wisdom of a law might want to consider how business is done elsewhere. But a court's role is not to speculate on how a law might be written more effectively; its role is to assess what laws are forbidden by our constitutions. And yet all pretense of state or federal constitutional interpretation is lost the moment a judge looks to foreign law. Roper shows that a concern with contemporary standards of decency will inevitably lead to reliance on foreign law. After all, although our nation has a unique experience with constitutional interpretation, we have no monopoly on humanity.
Of course, it would be naive to assume that the influence of foreign law will always result in an "expansion" of personal liberties. For example, Justice Scalia has observed that reliance on foreign law would jeopardize the Fourth Amendment's exclusionary rule, abortion rights, and our nation's adherence to the separation of church and state.[54] Therefore, the specter that judges will rely on foreign law when *289 interpreting our state and federal Constitutions is a broad-based concern.

C.
However, the problems with evolving standards of decency would not be eliminated even if we could somehow guarantee that the inquiry would be based solely on laws enacted by American legislatures. To begin, it is not at all clear exactly how such an objective analysis should proceed. For example, how many American jurisdictions are needed to show that society's standards of decency have evolved? In Stanford, the Court observed that only 15 of the 37 death penalty states refused to impose capital punishment on 16-year-old offenders and only 12 refused to do so for 17-year-old offenders.[55] In the 15 years between Stanford and Roper, a total of 18 state legislatures  or 48 percent of death penalty states  prohibited the execution of minors.[56] Despite a slight change in otherwise modest figures, the Roper majority declared a national "consensus" against the juvenile death penalty.[57] This declaration prompted a flurry of dissenting opinions from the four remaining members of the Court. In the close cases, even a reliance on solely objective indicia will lead to a vexing and contentious debate over how to read the numbers.
Moreover, all of this ignores the "danger in inferring a settled societal consensus from [such] statistics."[58] As Justice O'Connor observed in her concurring opinion in Thompson v. Oklahoma,[59] the death penalty has historically undergone dramatic fluctuations in social acceptance, reaching almost total extinction in the late 1960's and early 1970's.[60] As such, when the Court addressed the constitutionality of the death penalty in 1972, a reliance on evolving standards of decency would have compelled the conclusion that "the [death penalty] had become a relic, implicitly rejected by a new societal consensus."[61] Through hindsight, we now know that "any inference of a societal consensus rejecting the death penalty would have been mistaken."[62] But because "legislatures would very likely not have been able to revive" execution in the wake of a U.S. Supreme Court pronouncement that the practice violated the Constitution, the Court's mistaken assumption "would have been frozen into constitutional law."[63]
The final problem with drawing inferences from legislative responses to the death penalty is that such a practice fundamentally misunderstands the intent of constitutional prohibitions on cruel and unusual punishment. In concluding that electrocution is cruel and unusual, the majority points out that virtually every other death penalty state now uses lethal injection as their primary, if not solitary, method of execution. According to the majority, the switch to lethal injection has come "`because it is universally recognized as the most humane method of execution.'"
However, as noted previously, the Eighth Amendment only prohibits governments *290 from using cruel methods of punishment; it does not demand that they use the most humane methods. As such, it makes no sense to interpret that provision by looking to legislative enactments prompted by the desire to minimize cruelty. A legislative consensus that lethal injection is more humane than electrocution does not mean that electrocution is cruel in a more absolute sense. And yet, it seems to me that a more absolute definition of cruelty is, or at least should be, the concern under our constitutions.
The majority's alternative  a preoccupation with national consensus  is at once too lax and too strict in limiting methods of punishment. It is too lax because "[i]t reduces the function of the [E]ighth [A]mendment to bringing the occasionally deviant state into line with the rest."[64] As Professor Chemerinsky observed, such an "approach would mean that horrible torture would be permitted under the Constitution so long as most states engaged in the practice."[65]
The skin-patch hypothetical illustrates why reliance on contemporary standards of decency is too strict. To refresh, assume that a skin patch is developed which, when applied to an inmate's arm, executes a prisoner as quickly and painlessly as lethal injection. Assume further that only one state continues to use lethal injection and every other death penalty jurisdiction switches to the skin patch. Would such a shift render lethal injection cruel and unusual punishment? It would if "cruel and unusual" is defined according to contemporary standards. But it would be a stretch to say that simply having one's arm held down while attendants search for a vein and insert a needle is unconstitutionally "cruel."
For these, reasons, I believe that evolving standards of decency, even when based solely on evidence of legislative action, are best left out of the constitutional analysis. As alluded to above, I believe it far more accurate to say that the Eighth Amendment and article I, § 9, were designed solely to protect against "deliberate indifference to an unreasonable risk of severe and prolonged pain in execution."[66]
Regardless of the precise standard we use, hopefully the above has demonstrated that there is nothing to gain and much to lose by attempting to rely on contemporary standards of decency in assessing the constitutionality of a punishment. Of course, the U.S. Supreme Court's current case law forecloses us from construing the Eighth Amendment in line with these views. It does not, however, prevent us from refusing to make such an approach part and parcel of this state's constitution.

IV.
Because I sincerely believe this precedent will have adverse consequences in future cases, I respectfully dissent from the portion of the majority opinion that finds electrocution to be unconstitutional.
NOTES
[1] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[2] State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
[3] Ring, supra note 1.
[4] 2002 Neb. Laws, L.B. 1.
[5] State v. Gales, 265 Neb. 598, 626, 658 N.W.2d 604, 625 (2003).
[6] Id.
[7] Id. at 636, 658 N.W.2d at 631.
[8] Mata I, supra note 2.
[9] See State v. Mata, 269 Neb. xxii (No. S-04-1332, Jan. 20, 2005).
[10] State v. Clapper, 273 Neb. 750, 732 N.W.2d 657 (2007).
[11] See State v. Sklenar, 269 Neb. 98, 690 N.W.2d 631 (2005).
[12] See State v. Merrill, 273 Neb. 583, 731 N.W.2d 570 (2007).
[13] State v. Kula, 254 Neb. 962, 579 N.W.2d 541 (1998).
[14] See Mata I, supra note 2.
[15] See State v. Thomas, 268 Neb. 570, 685 N.W.2d 69 (2004).
[16] See, Mata I, supra note 2 (explaining double jeopardy prohibitions); State v. White, 254 Neb. 566, 577 N.W.2d 741 (1998).
[17] See State v. Urbano, 256 Neb. 194, 589 N.W.2d 144 (1999) (explaining ex post facto prohibitions).
[18] See Mate I, supra note 2. citing Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
[19] Gales, supra note 5, 265 Neb. at 636, 658 N.W.2d at 631.
[20] See, State v. Ring, 204 Ariz. 534, 65 P.3d 915 (2003); State v. Lovelace, 140 Idaho 53, 90 P.3d 278 (2003).
[21] Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
[22] See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
[23] See Dobbert, supra note 21.
[24] Id., 432 U.S. at 293-94, 97 S.Ct. 2290.
[25] See id.
[26] Id., 432 U.S. at 297, 97 S.Ct. 2290.
[27] See id.
[28] People v. District Court, 834 P.2d 181 (Colo.1992).
[29] See Neb.Rev.Stat. § 29-2519 (Cum.Supp. 2006).
[30] Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).
[31] Summerlin v. Stewart, 341 F.3d 1082 (9th Cir.2003).
[32] Id. at 1105-06.
[33] State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007).
[34] See Schriro, supra note 30.
[35] See Hessler, supra note 33.
[36] See, U.S. v. Quinones, 313 F.3d 49 (2d Cir.2002); U.S. v. Higgs, 353 F.3d 281 (4th Cir.2003); U.S. v. Allen, 406 F.3d 940 (8th Cir.2005).
[37] See, Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).
[38] In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).
[39] See, Terrell v. State, 276 Ga. 34, 572 S.E.2d 595 (2002); Lovelace, supra note 20; State v. Glass, 136 S.W.3d 496 (Mo.2004); State v. Hunt, 357 N.C. 257, 582 S.E.2d 593 (2003).
[40] See State v. Palmer, 257 Neb. 702, 600 N.W.2d 756 (1999), citing Joubert v. Hopkins, 75 F.3d 1232 (8th Cir.1996).
[41] See Livingston v. Metropolitan Util. Dist., 269 Neb. 301, 692 N.W.2d 475 (2005).
[42] United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).
[43] Chaffin v. Stynchcombe, 412 U.S. 17, 30, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).
[44] See Corbitt v. New Jersey, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978).
[45] See id.
[46] Hessler, supra note 33.
[47] See id.
[48] See § 29-2520.
[49] See § 29-2521.
[50] See Gales, supra note 5.
[51] See id., citing Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
[52] Gales, supra note 5.
[53] See, Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
[54] See State v. Simants, 197 Neb. 549, 250 N.W.2d 881 (1977) (discussing capital sentencing procedures), disapproved on other grounds, State v. Reeves, 234 Neb. 711, 453 N.W.2d 359 (1990), vacated 498 U.S. 964; 111 S.Ct. 425, 112 L.Ed.2d 409.
[55] See id.
[56] Proffitt, supra note 53, 428 U.S. at 249.
[57] Id., 428 U.S. at 252, 96 S.Ct. 2960.
[58] See Simants, supra note 54.
[59] Spaziano, supra note 53.
[60] Gales, supra note 5, 265 Neb. at 612-13, 658 N.W.2d at 616 (emphasis in original), quoting Spaziano, supra note 53.
[61] See Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985).
[62] See, e.g., Kansas v. Marsh, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006).
[63] See Ring, supra note 1 (Breyer, J., concurring in judgment).
[64] See Chaffin, supra note 43.
[65] See Proffitt, supra note 53.
[66] Simants, supra note 54, 197 Neb. at 559, 250 N.W.2d at 888.
[67] See, Gales, supra note 5; Simants, supra note 54.
[68] See Hessler, supra note 33.
[69] Tuilaepa v. California, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).
[70] Id., 512 U.S. at 974, 114 S.Ct. 2630.
[71] Tuilaepa, supra note 69.
[72] Id., 512 U.S. at 973, 114 S.Ct. 2630 (citations omitted).
[73] Id.
[74] See State v. Palmer, 224 Neb. 282, 399 N.W.2d 706 (1986).
[75] See Palmer, supra note 40, citing Joubert, supra note 40. See, also, Palmer v. Clarke, 408 F.3d 423 (8th Cir.2005).
[76] Reeves, supra note 54, 234 Neb. at 754, 453 N.W.2d at 386,
[77] State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (1998).
[78] Id.
[79] Id. at 521-22, 586 N.W.2d at 635 (emphasis supplied).
[80] See, e.g., id.; White, supra, note 16.
[81] State v. White, 239 Neb. 554, 477 N.W.2d 24 (1991), citing Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).
[82] Schad, supra note 81, 501 U.S. at 637, 111 S.Ct. 2491.
[83] See Schad, supra note 81.
[84] Richardson v. United States, 526 U.S. 813, 820, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999).
[85] Id., 526 U.S. at 817, 119 S.Ct. 1707.
[86] See Hessler, supra note 33.
[87] See, id.; State v. Gales, 269 Neb. 443, 694 N.W.2d 124 (2005).
[88] Mata I, supra note 2.
[89] See, e.g., Gales, supra note 87 (and cases cited therein).
[90] See, e.g., id.; State v. Joubert, 224 Neb. 411, 399 N.W.2d 237 (1986); Simants, supra note 54.
[91] State v. Anderson and Hochstein, 207 Neb. 51, 71-72, 296 N.W.2d 440, 453 (1980).
[92] State v. Bjorklund, 258 Neb. 432, 604 N.W.2d 169 (2000); State v. Ryan, 248 Neb. 405, 534 N.W.2d 766 (1995); State v. Alvarez, 182 Neb. 358, 154 N.W.2d 746 (1967).
[93] See State v. Moore, 272 Neb. 71, 718 N.W.2d 537 (2006).
[94] See Gales, supra note 87.
[95] See Mata I, supra note 2, 266 Neb. at 702, 668 N.W.2d at 479.
[96] See Ryan, supra note 92.
[97] State v. Moore, 273 Neb. 495, 730 N.W.2d 563 (2007).
[98] State v. Galindo, case No. S-04-1326; State v. Sandoval, case No. S-05-142; State v. Vela, case No. S-07-138.
[99] U.S. Const. amend. VIII; Neb. Const. art. I, § 9.
[100] State v. Hurhenca, 266 Neb. 853, 862, 669 N.W.2d 668, 675 (2003), quoting State v. Moore, 256 Neb. 553, 591 N.W.2d 86 (1999).
[101] In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).
[102] Id. See, also. Campbell v. Wood, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (Blackmun, J., dissenting from denial of certiorari).
[103] See Deborah W. Denno, Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century, 35 Wm. & Mary L.Rev. 551 (1994).
[104] Kemmler v. Durston, 119 N.Y. 569, 24 N.E. 6 (1890).
[105] In re Kemmler, supra note 101.
[106] Id., 136 U.S. at 442, 10 S.Ct. 930.
[107] Kemmler, supra note 104.
[108] See In re Kemmler, supra note 101, 136 U.S. at 447, 10 S.Ct. 930.
[109] See id.
[110] Id., 136 U.S. at 447, 10 S.Ct. 930.
[111] Id. See, also, Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) (discussing holding in In re Kemmler, supra note 101).
[112] In re Kemmler, supra note 101, 136 U.S. at 448-49, 10 S.Ct. 930.
[113] Id.
[114] See Glass v. Louisiana, 471 U.S. 1080, 1081, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari; Marshall, J., joins).
[115] 115. Malloy v. South Carolina, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915), cited in Alvarez, supra note 92.
[116] Id., 237 U.S. at 185, 35 S.Ct. 507.
[117] See Storti v. Commonwealth, 178 Mass. 549, 60 N.E. 210 (1901).
[118] State v. Tomasi, 75 N.J.L. 739, 747, 69 A. 214, 218 (1908).
[119] Francis v. Resweber, 329 U.S. 459, 462, 67 S.Ct. 374, 91 L.Ed. 422 (1947). See, also, Browning-Ferris Industries v. Kelco Disposal, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).
[120] Resweber, supra note 119, 329 U.S. at 464, 67 S.Ct. 374.
[121] Id.
[122] Id., 329 U.S. at 474, 67 S.Ct. 374 (Burton, J., dissenting).
[123] See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[124] See Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
[125] State v. Webb, 252 Conn. 128, 750 A.2d 448 (2000).
[126] See Poyner v. Murray, 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 299 (1993) (Souter, J., dissenting from denial of certiorari; Blackmun and Stevens, JJ., join). Accord Glass, supra note 114 (Brennan, J., dissenting from denial of certiorari; Marshall, J., joins).
[127] Neb. Const. art. XV, § 1; Fisher v. State, 140 Neb. 216, 299 N.W. 501 (1941); Wilson v. State, 87 Neb. 638, 128 N.W. 38 (1910).
[128] See, Moore, supra note 97; Gales, supra note 87; Mata I, supra note 2.
[129] Stewart v. LaGrand, 526 U.S. 115, 119 S.Ct. 1018, 143 L.Ed.2d 196 (1999).
[130] See, e.g., Ellen Kreitzberg & David Richter, But Can It Be Fixed? A Look at Constitutional Challenges to Lethal Injection Executions, 47 Santa Clara L.Rev. 445 (2007).
[131] In re Kemmler, supra note 101.
[132] Resweber, supra note 119, 329 U.S. at 463, 67 S.Ct. 374 (four-justice plurality opinion).
[133] Id., 329 U.S. at 474, 67 S.Ct. 374 (four-justice dissenting opinion).
[134] Gregg, supra note 123, 428 U.S. at 173, 96 S.Ct. 2909.
[135] See Resweber, supra note 119.
[136] See. Taylor v. Crawford, 487 F.3d 1072 (8th Cir.2007); Fierro v. Gomez, 77 F.3d 301 (9th Cir.1996), vacated on other grounds 519 U.S. 918, 117 S.Ct. 285, 136 L.Ed.2d 204; Harbison v. Little, 511 F.Supp.2d 872 (M.D.Tenn.2007).
[137] See Harbison, supra note 136.
[138] Id.
[139] Taylor, supra note 136.
[140] Trap v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (quoted in Gregg, supra note 123).
[141] Robinson, supra note 124, 370 U.S. at 666, 82 S.Ct. 1417.
[142] See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
[143] See id.
[144] See, e.g., Harmelin v, Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Compare Weems, supra note 111.
[145] Gregg, supra note 123, 428 U.S. at 171, 96 S.Ct. 2909.
[146] See Campbell, supra note 102 (Blackmun, J., dissenting from denial of certiorari).
[147] See Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878).
[148] Gregg, supra note 123.
[149] Furman, supra note 22.
[150] See Gregg, supra note 123 (plurality opinion).
[151] See, e.g., Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
[152] See Campbell, supra note 102 (Blackmun, J dissenting from denial of certiorari).
[153] Provenzano v. Moore, 744 So.2d 413 (Fla. 1999) (Harding, C.J., specially concurring).
[154] See Dawson v. State, 274 Ga. 327, 554 S.E.2d 137 (2001).
[155] Fla. Stat. Ann. § 922.105 (West 2001).
[156] Ala.Code § 15-18-82.1 (Cum.Supp.2007).
[157] See id.
[158] See Provenzano, supra note 153, 744 So.2d at 450 (Pariente, J., dissenting).
[159] Webb, supra note 125, 252 Conn., at 145, 750 A.2d at 457.
[160] See, Glass, supra note 114, 471 U.S. at 1085, 105 S.Ct. 2159 (Brennan. J dissenting; Marshall, J., joins), quoting Trop, supra note 140.
[161] Gregg, supra note 123, 428 U.S. at 173, 96 S.Ct. 2909, quoting Trop, supra note 140.
[162] Resweber, supra note 119, 329 U.S. at 473-74, 67 S.Ct. 374 (four-justice dissenting opinion).
[163] See Wilkerson, supra note 147.
[164] Glass, supra note 114, 471 U.S. at 1085, 105 S.Ct. 2159 (Brennan, J., dissenting).
[165] Provenzano, supra note 153, 744 So.2d at 428-29 (Shaw, J. dissenting).
[166] Dawson, supra note 154, 274 Ga. at 334, 554 S.E.2d at 143, citing and quoting In re Kemmler, supra note 101.
[167] See Lambert v. Buss, 498 F.3d 446 (7th Cir.2007).
[168] See Taylor, supra note 136.
[169] Id.
[170] Resweber, supra note 119.
[171] See Harbison, supra note 136.
[172] Id., 511 F.Supp.2d at 894.
[173] See Resweber, supra note 119 (four-justice plurality opinion).
[174] See Trop, supra note 140.
[175] Id.
[176] Id., 356 U.S. at 89 n. 4, 78 S.Ct. 590.
[177] Id.
[178] See Resweber, supra note 119.
[179] See 1913 Neb. Laws, ch. 32, § 2711, p. 108.
[180] Weems, supra note 111, 217 U.S. at 373, 30 S.Ct. 544.
[181] See, e.g., State v. Bakewell, 273 Neb. 372, 730 N.W.2d 335 (2007); State v. Sims, 272 Neb. 811, 725 N.W.2d 175 (2006); State v. Fernando-Granados, 268 Neb. 290, 682 N.W.2d 266 (2004); State v. Burdette, 259 Neb. 679, 611 N.W.2d 615 (2000).
[182] See Webb, supra note 125.
[183] . See State v. Tompkins, 272 Neb. 547, 723 N.W.2d 344 (2006).
[184] See, Taylor, supra note 136; Fierro, supra note 136.
[185] See Fierro, supra note 136.
[186] State v. Michalski, 221 Neb. 380: 377 N.W.2d 510 (1985), citing Gregg, supra note 123.
[187] Michalski, supra note 186; State v. Ruzicka, 218 Neb. 594, 357 N.W.2d 457 (1984); State v. Tucker, 183 Neb. 577, 162 N.W.2d 774 (1968).
[188] See Robthson, supra note 124.
[189] Gregg, supra note 123, 428 U.S. at 174, 96 S.Ct. 2909.
[190] In re Petition of Nebraska Community Corr. Council, 274 Neb. 225, 230, 738 N.W.2d 850, 854 (2007), quoting State v. Divis, 256 Neb. 328, 589 N.W.2d 537 (1999).
[191] See Thomas, supra note 15.
[192] See State v. Hynek, 263 Neb. 310, 640 N.W.2d 1 (2002).
[193] Brief for appellee at 46.
[194] Dorland's Illustrated Medical Dictionary 625 (27th ed.1994).
[195] Id. at 440, 640 N.W.2d 1.
[196] See id. at 302.
[197] Resweber, supra note 119, 329 U.S. at 474, 67 S.Ct. 374 (four-justice dissenting opinion).
[198] Jones v. State, 701 So.2d 76, 87 (Fla.1997) (Shaw, J., dissenting).
[199] See Mata I, supra note 2.
[200] See Neb.Rev.Stat. § 29-2522 (Cum.Supp. 2006).
[201] See, State v. McDermott, 200 Neb. 337, 263 N.W.2d 482 (1978); Iron Bear v. Jones, 149 Neb. 651, 32 N.W.2d 125 (1948). Cf., Malloy, supra note 115; Poland v. Stewart, 117 F.3d 1094 (9th Cir.1997); State v. Jones, 200 La. 808, 9 So.2d 42 (1942); State v. Brown, 342 Mo. 53, 112 S.W.2d 568 (1937); State v. Fitzpatrick, 211 Mont. 341, 684 P.2d 1112 (1984); Alberty v. State, 10 Okla.Crim. 616, 140 P. 1025 (1914); Ex parte Granviel, 561 S.W.2d 503 (Tex.Crim.App.1978) (en banc).
[202] See, § 29-2532 and Neb.Rev.Stat. § 29-2533 (Reissue 1995); 1913 Neb. Laws, ch. 32, § 1, p. 108. Cf. Dawson, supra note 154.
[203] See, People v. Samayoa, 15 Cal.4th 795, 864, 938 P.2d 2, 48, 64 Cal.Rptr.2d 400, 446 (1997). Accord People v. Holt, 15 Cal.4th 619, 937 P.2d 213, 63 Cal.Rptr.2d 782 (1997). See, also. Com. v. Terry, 513 Pa. 381, 521 A.2d 398 (1987).
[204] See, Moore, supra note 97; State v. Palmer, 246 Neb. 305, 518 N.W.2d 899 (1994); Neb.Rev.Stat. § 29-2528 (Reissue 1995).
[205] See Moore, supra note 97.
[206] § 29-2528.
[207] See Moore, supra note 97.
[208] See Palmer, supra note 204.
[1] State v. Hurbenca, 266 Neb. 853, 669 N.W.2d 668 (2003); State v. Moore, 256 Neb. 553, 591 N.W.2d 86 (1999); State v. Michalski, 221 Neb. 380, 377 N.W.2d 510 (1985); State v. Brand, 219 Neb. 402, 363 N.W.2d 516(1985).
[2] U.S. Const, amend. VIII; Neb. Const., art. 1, § 9.
[3] In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).
[4] Glass v. Louisiana, 471 U.S. 1080, 1081, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari; Marshall, J., joins).
[5] Id., 471 at 1083, 105 S.Ct. 2159.
[6] See, e.g., Trident Center v. Connecticut General Life Ins., 847 F.2d 564 (9th Cir.1988) (discussing Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co., 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)).
[7] John E. Nowak & Ronald D. Rotunda, Constitutional Law § 2.13 (7th ed.2004).
[8] Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
[9] Id.
[10] Long, supra note 8.
[11] Id., 463 U.S. at 1040-41, 103 S.Ct. 3469.
[12] Nowak & Rotunda, supra note 7 at 112.
[13] Id.
[14] Long, supra note 8, 463 U.S. at 1043, 103 S.Ct. 3469 (emphasis in original).
[15] Id.
[16] Id., 463 U.S. at 1044, 103 S.Ct. 3469. See, also, South Dakota v. Neville, 459 U.S. 553, 103 S.Ct, 916, 74 L.Ed.2d 748 (1983); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977).
[17] Long, supra note 8, 463 U.S. at 1044, 103 S.Ct. 3469 (emphasis in original).
[18] Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (emphasis supplied). Accord, Nelson v. Campbell, 541 U.S. 637, 124 S.Ct. 2117, 158, L.Ed.2d 924 (2004); Hope v. Pelzer, 536 U.S. 730, 122 S.Ct, 2508, 153 L.Ed.2d 666 (2002); Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
[19] Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion).
[20] Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947).
[21] Trap, supra note 19, 356 U.S. at 107, 78 S.Ct. 590 (Brennan, J., concurring).
[22] Resweber, supra note 20, 329 U.S. at 464 (emphasis supplied).
[23] Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).
[24] Id., 501 U.S. at 297, 111 S.Ct. 2321 (emphasis in original) (quoting Estelle, supra note 18).
[25] Id. (emphasis in original) (quoting Estelle, supra note 18).
[26] Brief for amicus curiae of the Criminal Justice Legal Foundation in support of respondents at 17, Raze v. Rees, case No. 07-5439, 2007 WL 2781088 (U.S. July 11, 2007).
[27] Gregg, supra note 18; Michalski, supra note 1.
[28] In re Kemmler, supra note 3, 136 U.S. at 446, 10 S.Ct. 930.
[29] See id.
[30] Resweber, supra note 20, 329 U.S. at 464, 67 S.Ct. 374.
[31] Brief for amicus curiae of the Criminal Justice Legal Foundation in support of respondents, supra note 26 at 18.
[32] Trop, supra note 19.
[33] Id., 356 U.S. at 101, 78 S.Ct. 590.
[34] Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), abrogated on other grounds, Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
[35] Brief for amicus curiae of the Criminal Justice Legal Foundation in support of respondents, supra note 26 at 11.
[36] Id.
[37] See Bryan v. Moore, 528 U.S. 960, 120 S.Ct. 394, 145 L.Ed.2d 306 (1999) (granting certiorari to Provenzano v. Moore, 744 So.2d 413 (Fla.1999)).
[38] See William H. Rehnquist, Act Well Your Part: Therein All Honor Lies, 7 Pepp. L.Rev. 227 (1980).
[39] Furman v. Georgia, 408 U.S. 238, 383, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting).
[40] See, e.g., Laurence H. Tribe, God Save This Honorable Court 45 (1985).
[41] See, e.g., Madsen v. Women's Health Center, Inc., 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); Thomas v. Anchorage Equal Rights Com'n, 102 P.3d 937 (Alaska 2004).
[42] Antonin Scalia, Originalism: The Lesser Evil, 57 U. Cin. L.Rev. 849, 856 (1989).
[43] Stanford, supra note 34.
[44] Id., 492 U.S. at 378, 109 S.Ct. 2969 (plurality opinion) (emphasis in original).
[45] Id., 492 U.S. at 379, 109 S.Ct. 2969.
[46] Id., 492 U.S. at 382, 109 S.Ct. 2969 (O'Connor, J., dissenting).
[47] See id.
[48] Roper, supra note 34.
[49] Id., 543 U.S. at 575, 125 S.Ct. 1183.
[50] Id.
[51] Stanford, supra note 34, 492 U.S. at 369 n. 1 (emphasis in original).
[52] Id.
[53] Roper, supra note 34, 543 U.S. at 577, 125 S.Ct. 1183.
[54] Roper, supra note 34 (Scalia, I., dissenting).
[55] Stanford, supra note 34.
[56] Roper, supra note 34 (Scalia, J., dissenting).
[57] Id., 543 U.S. at 567, 125 S.Ct. 1183 (majority opinion).
[58] Thompson v. Oklahoma, 487 U.S. 815, 854, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring in judgment).
[59] Id.
[60] Id.
[61] Id., 487 U.S. at 855, 108 S.Ct. 2687.
[62] Id.
[63] Id.
[64] Erwin Chemerinsky, The Vanishing Constitution, 103 Harv. L.Rev. 43, 88 n. 200 (1989).
[65] Id.
[66] Brief for amicus curiae of the Criminal Justice Legal Foundation in support of respondents, supra note 26 at 18.